Samuel **FULTON**, No. 127–943, Appellant,

v.

**WARDEN, MARYLAND PENITENTIARY,** Appellee.

Ronald Fitzgerald **ROBINSON**, # 125759, Appellant,

v.

**WARDEN, MARYLAND PENITENTIARY,** Appellee.

Nos. 81–6695(L), 82–6040.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1983.

Decided Sept. 20, 1984.

Thomas Ricciuti, Baltimore, Md. (Richard S. Davis, Christopher H. Buckley, Jr., Beveridge & Diamond, P.C., Washington, D.C., on brief), for appellants.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore, Md. (Stephen H. Sachs, Atty. Gen., of Maryland, Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, and HALL and PHILLIPS, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

Samuel Fulton and Ronald Robinson were each convicted of first-degree murder in a Maryland court in the early 1970's. Both asserted alibi defenses. Their convictions arose from entirely separate crimes and their appeals are related only by the legal issue on which they both petitioned for habeas corpus relief.

In 1978, in unrelated actions, Fulton and Robinson each petitioned for a writ of habeas corpus in the United States District Court for the District of Maryland. Both Fulton and Robinson were found to have exhausted their state remedies, and the district court concluded that the instructions in both trials were constitutionally infirm. It is now conceded that the juries which convicted them were erroneously instructed with respect to the burden of

proof concerning their defenses of alibi. In both instances, however, the district court concluded that the errors were harmless under the particular circumstances of each case. Both Fulton and Robinson appealed and their cases were consolidated for argument before us.[1] After reviewing the records in both cases, we are convinced that the district court correctly decided both cases. Accordingly, we affirm both judgments.

## I.

Samuel Fulton was sentenced to life in prison for the first-degree murder of his wife. The state's medical examiner placed the time of Mrs. Fulton's death at between 5:00 a.m. and 11:00 a.m. on February 28, 1973. The time was narrowed further by Mrs. Fulton's sister, Anrair Clay, who was staying at the Fulton residence. Ms. Clay testified that she saw and spoke with Mrs. Fulton from approximately 7:45 to 8:10 a.m. on the morning of the murder.

Edward Cates, owner of a neighborhood store three blocks from the Fulton's home, testified that he saw Mr. Fulton for approximately five minutes between 8:30 and 8:45 during the morning of Mrs. Fulton's death. Cates testified that Mr. Fulton asked for change for the streetcar and told Cates he was late for work.[2] Cates found nothing unusual in Fulton's demeanor and testified that he looked "normal". Fulton now contends that this testimony constituted an alibi, which, absent an erroneous jury instruction, could have created reasonable doubt as to his guilt.

There was uncontroverted evidence at trial that Fulton arrived at his home slightly before 8:30 p.m. on February 27, 1973. Fulton had been separated from his family and residing in another state for the previous two months. Two witnesses present that evening, Anrair Clay and Fulton's sis-

ter Joyce, testified that Mr. and Mrs. Fulton had an argument. Both also testified that Fulton threatened his wife with an axe at one point. The argument subsided, however, and both Fultons later went upstairs to bed together. Anrair Clay, apparently worried about her sister, called upstairs to check on Mrs. Fulton at approximately 11:00 p.m. and later at 5:00 a.m. At both points, Mrs. Fulton indicated that her husband was with her and everything was "all right." Anrair Clay saw Mrs. Fulton again the next morning from roughly 7:45 to 8:10 a.m. when they were sending their children to school. As Ms. Clay went back upstairs to return to bed, she saw a shape in her sister's bed that she assumed to be Mr. Fulton. Ms. Clay testified that she slept until approximately 11:55 a.m. and then discovered her murdered sister in the next bedroom. Mrs. Fulton was on her back in bed and had been bludgeoned to death with a blunt instrument eventually determined to be a carpenter's maul found hidden in a china closet downstairs.

The police, on the basis of the above facts, procured a warrant for Mr. Fulton's arrest. Mr. Fulton surrendered himself at approximately 10:30 p.m. on February 28. Between 10:40 and 1:30 a.m., Mr. Fulton was examined for physical evidence and interrogated by a police detective. A benzidene test for traces of blood on Fulton's hands yielded positive results indicating the presence of human blood around the cuticle areas of three fingernails. At trial, however, there was some doubt cast on the accuracy of the test and the qualifications of the individual who administered it. Also, an oral statement voluntarily made during the interrogation was admitted at trial. The statement tended to suggest that Fulton knew the nature of the murder weapon, though the exact contents of the statement were in dispute.

---

1. After argument, we stayed our decision pending that of the Supreme Court in *Koehler v. Engle,* No. 83–1, believing that the Supreme Court would discuss the harmless-error test as it relates to burden-shifting jury instructions. *Koehler* was decided March 26, 1984 by an equally-divided court. —— U.S. ——, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984), *affirming* 707 F.2d 241 (6 Cir.1983). No opinions were filed.

2. The evidence showed that Fulton was unemployed at the time of the murder.

At trial, Mr. Fulton attempted to create reasonable doubt as to his guilt by suggesting that Mrs. Fulton was actually killed by her paramour, Louis Rosado. Some circumstantial evidence seemed to support this possibility. Approximately ten days prior to her death, Mrs. Fulton resumed a relationship with Rosado, to whom she had previously been engaged. Rosado testified at trial that he was in love with Mrs. Fulton and believed that she intended to divorce her husband and marry him. Rosado had visited Mrs. Fulton every night during the week prior to her death, and he testified that he had spent the night with her on February 26. Furthermore, he had visited Mrs. Fulton at her home at approximately 6:30 or 7:00 on the evening of February 27, shortly before Mr. Fulton arrived. Fulton suggests a possible motive for Rosado might have been jealousy at an apparent reapproachment between the Fultons.[3]

A second piece of circumstantial evidence suggesting Rosado's involvement was a Pabst beer can with his fingerprints on it found in the bedroom. Anrair Clay testified that she bought a six-pack of Pabst sometime after 8:30 p.m. on February 27, as there was no beer in the refrigerator at that time. The record is silent as to whether there were other beer cans around the house. The police found both a can of Pabst and a soft drink can on a table in the bedroom. Mr. Fulton's fingerprints were on the soft drink can. Mr. Rosado's prints were later identified on the beer can. Rosado testified at trial, however, that he worked from 5:00 a.m. or 5:30 a.m. until around 11:30 a.m. on February 28. At the time, Rosado was employed by the Baltimore City Sanitation Department. No evidence contradicting Rosado's story was introduced at trial.

## II.

Ronald Robinson was convicted of: first-degree murder, assault with intent to murder, attempted robbery with a deadly weapon, and the unlawful use of a handgun. Robinson was sentenced to two life terms and an additional term of years.

The crime Robinson was charged with took place in the Lenox Furniture Store in Price George's County on November 8, 1972, between 2:00 and 3:00 p.m. Two of the store's employees were shot to death. A third, Robert Loewy, was shot twice but lived. Mr. Loewy testified at trial that on the day of the crimes, shortly before noon, an individual fitting Robinson's description entered the store looking for a lamp. At that time, Loewy helped the customer who eventually did decide on a particular lamp. Loewy's possible in-court identification of Robinson was suppressed. He did, however, identify a sales slip for the lamp which he had written for the customer under the name of "Jeffrey Robinson." The ticket was signed, however, in the name of "Ronald Robinson." An FBI handwriting expert later testified that the signature on the sales slip for the lamp had been written by the defendant.

Loewy testified that the same man came back to the store later in the afternoon to return the lamp. Loewy filled out a sales slip for the return of the lamp and the purchase of a reclining chair. With the exchange apparently over, Loewy returned to other matters. After a few moments, the customer returned asking whether the chair could be obtained in a different color. The customer then brandished a revolver and demanded the money in the cash register. He then opened fire, shot three employees, emptied the cash drawer, and fled.

Two other witnesses placed Robinson on the scene. Richard Marcus, a student and part-time employee, began work immediately before the shooting. Marcus, who was not injured, observed the assailant for approximately fifteen minutes and identified Robinson. Staff Sergeant Claude Jefferson, a neuropsychiatric supervisor at Walter Reed Hospital, was also in the store when the assailant entered in the after-

---

**3.** Rosado testified that he was not aware that Mr. Fulton would be returning home on February 27 and that he first became aware of Fulton's return when he heard that Fulton was being sought for the murder of his wife.

noon. Jefferson left before the shooting but identified Robinson as being in the store.

Other circumstantial evidence implicated Robinson. First, the police recovered clothing from Robinson's home which matched Loewy's description of the gunman's clothing. Second, when Robinson was arrested, the police seized a loaded long-barreled .22 caliber revolver from his car, which Robinson then claimed as his own. At trial, a ballistics expert testified that the bullets which hit the victims could have been fired by that gun, but that the bullets were too mutilated, and the rifling too common, to permit positive identification.

Perhaps the most incriminating evidence against Robinson was the positive identification of two of his fingerprints on the scene. One of those prints was taken from the lamp and the other from the store counter.

Immediately after his arrest, Robinson denied ever having been in the Lenox Furniture Store, and also claimed to have been shooting basketball at an indoor recreation center at the time of the killings. However, the manager of the recreation center testified that no one had used the basketball court on the afternoon of February 8.

At trial, Robinson had a different alibi. His story was based on three witnesses. The first was an elderly female relative who testified that Robinson chopped wood for her from shortly after 11:00 a.m. until approximately 3:40 p.m. She also testified that Robinson made a telephone call from her house at 3:40 p.m. while he ate. Finally, she testified that at 4:15 p.m., Robinson went to the Post Office to pick up a check for her.

During the trial, the parties stipulated that a Postmistress would have testified, had she been called, that she had known Robinson for most of his life, and that at 4:00 p.m. on the day of the robbery, Robinson picked up a check for his "grandmother." A third witness, Robinson's seventeen-year-old girlfriend, testified that on the day of the killings, Robinson called her at about 2:30 p.m. and the two spoke until 3:00 p.m. Robinson argues that this testimony, absent an erroneous alibi instruction, could have created reasonable doubt as to his whereabouts during the afternoon in question.

### III.

At the close of the Fulton case, the state trial judge gave the following instruction concerning an alibi defense:

The defendant has the burden of proving an alibi defense and must do so by a preponderance of the evidence, not beyond a reasonable doubt. In order to prove an alibi the testimony must cover the whole time in which the crime by any possibility might have been committed and it should be subjected to rigid scrutiny.

A similar instruction was given at the close of the Robinson trial by the state trial judge who presided at it:

Now, the defendant in this case asserts the evidence of an alibi. Now you will understand, ladies and gentlemen, that an alibi is what we call an affirmative defense. It is of course a complete defense if you believe it. Obviously a person who is not at the scene could not complete the crime. We say it is an affirmative defense because this is the one time in this case where the defendant has the burden of proof. It is the only thing in the case as to which he has the burden of proof. On the defense of alibi the defense has the responsibility to satisfy you by a fair preponderance of the evidence that he was not in fact in the store and in fact was somewhere else. Now evidence has been introduced tending to show that the defendant was not present at the time and at the place where these offenses were committed. The defendant may not be convicted of the offenses with which he is charged unless the state proves beyond a reasonable doubt that the defendant was present at the time and place where the offense was committed. If after full and fair consideration of all the facts and circumstances in the evidence you find

that the defendant has satisfied the fair preponderance of the evidence concerning this man and that he was in fact somewhere else and not at the scene, then he must be acquitted.

■ There can be little doubt that both instructions are constitutionally infirm. *See In Re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) ("... the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *Patterson v. New York*, 432 U.S. 197, 215, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281 (1977) (a State must prove every ingredient of an offense beyond a reasonable doubt and it may not shift the burden of proof to the defendant); and *Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979) (a presumption which, although not conclusive, had the effect of shifting the burden of persuasion to the defendant is constitutionally infirm).

The instructions in each of these two trials can be taken to shift the burden of proof as to the element of presence from the prosecution to the defense. The state now concedes constitutional error but argues that, under the facts of each case, the errors were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In both cases, the district court agreed the errors were harmless. *Fulton v. Warden, Maryland Penitentiary*, 517 F.Supp. 485 (D.Md.1981); *Robinson v. Warden, Maryland Penitentiary*, 518 F.Supp. 219 (D.Md. 1981).

There are few areas of the law as fraught with uncertainty as analyses of harmless error. There is a threshold question as to whether burden-shifting errors such as these can ever be harmless. Su-

preme Court precedent has left this question unanswered, and different circuits have resolved the issue in different ways. *See, e.g., Lamb v. Jernigan*, 683 F.2d 1332, 1341 (11 Cir.1982) (a burden-shifting jury instruction does not require setting aside a defendant's conviction and sentence if the instruction is found harmless beyond a reasonable doubt); *Dietz v. Solem*, 640 F.2d 126, 131 (8 Cir.1981) (it is probable that a burden-shifting or conclusive presumption jury instruction is constitutional error in and of itself so that it is unlikely that the jury instruction can ever be harmless).[4]

■ Recent guidance from the Supreme Court has not been definitive. In *Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 976, 74 L.Ed.2d 823, 832 (1983), a plurality of the Court held that a conclusive presumption jury instruction was the equivalent of a directed verdict on the issue and contravened *Sandstrom, supra*. Four justices agreed that, barring certain delineated exceptions, a *Sandstrom* violation can never be harmless error. 460 U.S. at 87, 103 S.Ct. at 978, 74 L.Ed.2d at 835. However, Justice Stevens, whose vote was needed to make a majority, expressed the view in his concurring opinion that if the violation was less grievous, a harmless error determination could be made. 460 U.S. at 87, 103 S.Ct. at 978, 74 L.Ed.2d at 835. Similarly, a majority of the Court in *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 106 (1983), held: "Since *Chapman* the Court has consistently made it clear that it is the duty of the reviewing court to consider the trial record as a whole and to ignore errors that are harmless including most constitutional violations." Accordingly, we conclude that there is currently no *per se* rule of reversal for constitutional violations of the type present in *Fulton* and *Robinson*.[5] In

---

4. A dictum in *Cooper v. State of North Carolina*, 702 F.2d 481, 483 (4 Cir.1983) is to the effect that a jury charge which compels or even invites jurors to accept an unconstitutional view of the law can never be harmless error. The dictum cites *Sandstrom, supra*, 442 U.S. 526, 99 S.Ct. 2460, as authority, but a close reading of *Sand-*

*strom* shows that the point was expressly *not* decided. In any event, the statement in *Cooper* is unquestionably dictum and not binding on this panel.

5. As recognized in n. 1, *supra*, the Supreme Court has even more recently been unable to resolve the issue of whether *Sandstrom*-type

cases involving similar errors, we have always assessed the impact of those errors by carefully considering the record as a whole in each instance. *See e.g., Anderson v. Warden, Maryland Penitentiary,* 696 F.2d 296 (4 Cir.1982), and *Guthrie v. Warden, Maryland Penitentiary,* 683 F.2d 820 (4 Cir.1982).

█ Because these appeals arise from petitions for writs of habeas corpus, a strict harmless error analysis is not wholly appropriate. *Morris v. Maryland,* 715 F.2d 106 (4 Cir.1983). "On collateral review of an allegedly erroneous jury charge, a habeas petitioner must meet 'a stricter standard of proof' than is required on direct review of a criminal conviction." *Id.,* at 108, citing *Cooper, supra* n. 4, 702 F.2d at 483 n. 2. In *Morris* we recognized that the nature of habeas corpus proceedings requires application of the standard of proof delineated in *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977):

> ... our task on this appeal is not to apply the harmless error analysis of *Chapman v. California,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967), but rather the test laid down by *Henderson v. Kibbe. Henderson* requires us to determine 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' *Id.* at 154, 97 S.Ct. at 1736 (citations omitted)

715 F.2d at 108. There are errors that cannot be considered harmless on direct review but are nevertheless insufficient to render a trial so unfair as to justify use of the habeas corpus remedy.[6] Thus, we must ascertain whether the instructional errors at issue in *Fulton* and *Robinson*

rendered the trials fundamentally unfair, a more demanding standard to be satisfied than that required by the usual harmless error test.

### IV.

Apparently not appreciating the difference in approach required in direct and collateral attack established in *Henderson, supra,* the district court in both *Fulton* and *Robinson* used the less demanding harmless error analysis. Nevertheless, in both instances the district court found the errors harmless beyond a reasonable doubt. After carefully examining the record in each case, we agree. Not only did the errors at issue not render the trials fundamentally unfair, they were harmless as well.

### A. *Fulton*

█ Fulton's contention reduces itself to the assertion that his presence in Cates' store for approximately five *minutes* out of a possible three-and-one-half *hours* during which the crime could have been committed might have created reasonable doubt as to his presence. We are persuaded that this is not really a question of an alibi. Assuming Fulton was in Cates' store on the morning of the murder, this establishes nothing more than that Mr. Fulton was three blocks away from the scene of the murder for five of the two-hundred-ten minutes during which the crime could have been committed. Indeed, as Cates' testimony was uncontroverted at trial, there is every reason to believe the jury accepted it completely.

The real importance of Cates' testimony is to lend some support to the defense theory that Mrs. Fulton's paramour, Louis

---

burden-shifting instructional errors can ever be harmless. *Koehler, supra,* n. 1, presented precisely that issue. However, an equally divided Court affirmed the decision granting habeas corpus relief without opinion. Yet another opportunity to resolve the issue is presented in *Francis v. Franklin,* 720 F.2d 1206 (11 Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984). In light of the delays already caused by our abortive attempt to obtain clarification and the possibility that *Francis*

might not resolve the issue, we have decided not to delay disposition of these appeals further.

**6.** *Rose v. Lundy,* 455 U.S. 509, 543–4 & n. 8, 102 S.Ct. 1198, 1216 & n. 8, 71 L.Ed.2d 379 (1982) (Stevens, J. dissenting) (some errors which cannot be declared harmless on direct appeal nevertheless do not render a trial fundamentally unfair).

Rosado, was the culprit. Fulton attempts to convert what is really circumstantial evidence in support of an alternative theory into an "alibi" that was unconstitutionally tainted. Fulton's argument is that, absent the erroneous instructions, the jury could have attached more weight to Cates' testimony and might then have concluded that Rosado returned to the house after Fulton left and committed the murder. The structure of this argument reveals why the jury instruction could have had no adverse impact. There was no alibi defense for the instructions to taint, but only an alternative theory which was supported by Cates' uncontroverted testimony and Rosado's fingerprint on a beer can of uncertain origin.

We are unable to see how a jury instruction misallocating the burden of proof for an "alibi" was harmful to Fulton. The concept of an alibi is defined within the instruction as necessarily "cover[ing] the whole time" in which the crime could have been committed. By the terms of the instruction, the jury would conclude, as we do now, that an alibi is simply not involved here. The circumstantial evidence implicating Rosado could have created reasonable doubt but it was not an alibi. Cates' testimony simply does not account for Fulton's whereabouts for the overwhelming majority of the time during which the murder could have been committed, especially because for the short period that it does cover, it establishes Fulton to have been only three blocks away from the murder scene.

Because the paramour theory as well as the uncontroverted circumstantial evidence supporting it was before the jury, the record suggests that the jury duly considered the possibility that Rosado was the true culprit. The jury was properly instructed that the state bears the burden of proof to show beyond a reasonable doubt that Fulton committed the murder. There is no suggestion that the instructions imposed some burden on Fulton to prove someone else was guilty. Thus, there is every reason to believe that the jury considered the evidence about Rosado for what it was worth and still found Fulton guilty beyond a reasonable doubt. They could have reached this conclusion by any number of reasonable routes: that Fulton killed his wife before he got to Cates' store, that Fulton went back after visiting the store and then killed his wife, that Rosado's fingerprints were on a beer can that had been around for days, or that Rosado's uncontroverted testimony that he was at his job with the Sanitation Department for the entirety of the time the murder could have been committed exculpated him.

On the unique facts presented here, we conclude that the erroneous alibi instruction did not infect the entire trial so as to render it fundamentally unfair. *Henderson, supra.* Accordingly, we affirm the judgment denying habeas corpus relief.

### B. *Robinson*

■ Unlike the *Fulton* case, *Robinson* actually involves an alibi. Several individuals testified at trial that Robinson was at a different place during the time the robbery and murders at the Lenox Furniture Store were committed. Nevertheless, on the basis of uncontroverted physical evidence, we conclude the instructional error was harmless or at least failed to render the trial fundamentally unfair.

Robinson's alibi at trial was that he was chopping wood for an elderly relative. This alibi was untrue beyond any reasonable doubt. Two fingerprints were recovered from the scene of the crime. The first was taken from the store counter, the second was taken from the lamp returned by the "customer", soon to become armed robber, immediately before the shooting. The fingerprints are conclusive and what they prove is corroborated by all the eyewitness identifications, the ballistics reports, the inconsistencies in alibis presented at interrogation and at trial, and the handwriting identification on the sales slip. Moreover, the record is simply barren of any explanation, plausible or implausible, for how Robinson's fingerprints appeared at the scene of a robbery and brutal murder when he was presumably chopping wood. Robinson

was in the store; the alibi was a fabrication beyond any conceivable doubt.

■ For an erroneous alibi instruction to render a trial fundamentally unfair, there must be some articulable possibility that the alibi could be true. To hold otherwise would elevate procedure over substance to an extent where this review would be governed by a *per se* rule that does not admit of flexibility. Believing that no *per se* rule exists, and that the alibi here was unquestionably fabricated, we also affirm this judgment denying habeas corpus relief.

AFFIRMED.

JAMES DICKSON PHILLIPS, Circuit Judge, dissenting:

The majority affirms the denial of habeas corpus relief in both of these cases on the basis that in each the state trial court's concededly erroneous burden-shifting alibi instruction was harmless beyond a reasonable doubt because of the overwhelming evidence of guilt coupled with the weakness in each of the alibi evidence.

With respect, I disagree with that result and in fundamental respects with the majority's mode of analysis. I believe that a special jury instruction on alibi that effectively shifts to the defendant the burden of persuasion on the disputed issue of presence is a constitutional error that must be deemed never harmless. On that view it is of course inappropriate for an appellate court, once the constitutional error is found, to conduct any inquiry into possible harmlessness based upon the weight of the evidence of guilt.

This conclusion seems to me compelled by authoritative Supreme Court decisions and by an independent consideration of the nature of this particular error, the proper function of harmless error review in general, and the relative roles of juries and appellate courts in assessing the evidence of guilt in criminal cases.

On this basis, I would reverse in both of these cases and remand with directions to issue the writs unless new trials were provided. In both cases it is plain that the alibi instructions did effectively shift to the respective habeas petitioners the burden of persuasion on the disputed issues of presence.

I

In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court rejected the view theretofore held that "all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful." *Id.* at 21, 87 S.Ct. at 826. In opening the possibility that even some constitutional error might be "declared" by appellate courts to be harmless "beyond a reasonable doubt," the Court emphasized, however, that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 23, 87 S.Ct. at 827. Specific examples of *per se* harmful constitutional error were given: coerced confession, *citing Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); denial of counsel, *citing Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); and trials by a biased judge, *citing Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). And, focussing generally on the jury trial process itself, the Court observed, without offering specific illustrations, that "[a]n error ... which possibly influenced the jury adversely to a litigant cannot ... be conceived of as harmless." 386 U.S. at 23–24, 87 S.Ct. at 827–828.

*In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1969) soon thereafter established—if it had not already been established—that the "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime ... charged." And later Supreme Court decisions have simply made an obvious application of this principle to find constitutional error in jury instructions that, in a variety of ways, effectively cast upon the accused rather than the state the burden of persuasion in respect of an essential element of the crime

charged. *See, Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (direct placement of burden upon accused to prove provocation in order to reduce murder to manslaughter); *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983) (presumption that may have been understood to compel finding of intent from proof of other facts); *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (same).

At least since *Mullaney,* therefore, it has been established that jury instructions that effectively shift to an accused the burden of persuasion (by any quantum of proof) on an element of the crime violate due process. The only question that remained was whether, under the *Chapman* rationale, such a constitutional error might nevertheless be found harmless or must, on the contrary, always be deemed harmful.

Concededly, no post-*Chapman/Winship* decision of the Supreme Court has squarely and authoritatively determined that question.[1] But I am persuaded that the critical post-*Chapman/Winship* Supreme Court decisions that have addressed the general problem of the effect of arguably erroneous burden-shifting instructions strongly imply, or indeed simply assume, that any found effectively to have misplaced the burden on an accused are to be treated as *per se* harmful.

These decisions have actually addressed dispositively only the issue of whether the challenged jury instruction did or did not involve constitutional error. Specifically, they have decided only the predicate questions of whether the instruction did or did not relate to an element of the offense as to which, per *Winship,* the burden of proof could not constitutionally be placed upon the accused, *see Mullaney,* 421 U.S. at 690–704, 95 S.Ct. at 1885–1892; *Patterson v. New York,* 432 U.S. 197, 201–216, 97 S.Ct. 2319, 2322–2330, 53 L.Ed.2d 281 (1977) ("sanity"); or whether by incorporating a presumption the instruction did or did not effectively shift to the accused the burden of persuasion on a conceded element of the crime, *see Johnson,* 460 U.S. at 83–88, 103 S.Ct. at 976–978 (intent); *Sandstrom,* 442 U.S. at 514–27, 99 S.Ct. at 2454–60 (same).[2]

---

**1.** In *Sandstrom v. Montana,* 442 U.S. at 526–27, 99 S.Ct. at 2460–61, the Court expressly declined to decide the issue, leaving it open for possible first instance consideration by the state court upon remand. Later, the issue was inconclusively treated in plurality and dissenting opinions in *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 *see* note 2, *infra.* Most recently, possible authoritative resolution was prevented by an equal division of the Court in *Engle v. Koehler,* 707 F.2d 241 (6th Cir.1983), *aff'd by an equally divided court,* — U.S. —, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984).

This court has not before addressed and decided the issue directly. *But cf. Tweety v. Mitchell,* 682 F.2d 461 (4th Cir.1982).

Other federal courts are in substantial conflict both in their approaches to and their resolutions of the issue as it has been presented in a variety of contexts. *See, e.g., In re Hamilton,* 721 F.2d 1189, 1192 (9th Cir.1983) ("reviewing court cannot rationally conclude beyond a reasonable doubt that a juror did not rely on an unconstitutional *Sandstrom* instruction where intent is a disputed issue"; weight of evidence is immaterial); *Engle v. Koehler,* 707 F.2d 241, 246 (6th Cir.1983) (if intent a disputed issue, *Sandstrom* instruction "can be prejudicial even if overall proof of intent or malice is substantial"), *aff'd by an equally divided court,* — U.S. —,

104 S.Ct. 1673, 80 L.Ed.2d 1 (1984); *Lamb v. Jernigan,* 683 F.2d 1332, 1341 (11th Cir.1982) (burden-shifting instruction may be "harmless if the evidence of guilt was so overwhelming that the error cannot have contributed to the jury's decision to convict"); *United States v. Alston,* 551 F.2d 315, 320 & n. 24 (D.C.Cir.1976) ("strong evidence of guilt" may support finding that burden-shifting instruction was not prejudicial); *Trimble v. Stynchcombe,* 481 F.2d 1175, 1176 (5th Cir.1973) (per curiam) (harmless error principle inapplicable where alibi instruction is wholly inconsistent with the reasonable doubt instruction); *Stump v. Bennett,* 398 F.2d 111, 123 (8th Cir.1968) (en banc) (instruction that shifts burden of proof on alibi not harmless even if "evidence conclusively demonstrates guilt"); *Simmons v. Dalsheim,* 543 F.Supp. 729, 749 (S.D.N.Y.1982) (burden-shifting instructions may be found harmless, but "only in a rare case"); *Graham v. Maryland,* 454 F.Supp. 643 (D.Md.1978) (harmless error doctrine inapplicable to erroneous instructions that shift burden of proof with regard to an alibi defense).

**2.** Of these decisions, only *Sandstrom* and *Johnson* advert to the harmless error possibility. *Sandstrom,* as indicated in note 1, *supra,* expressly declined to address it.

Concededly, both the plurality and the dissenting opinions in *Johnson* employ harmless

The various opinions in these post-*Winship* cases imply to me that at least a majority of the members of the present Court now simply assume that if a challenged instruction either (a) relates to an element of the offense (as opposed to a matter of "affirmative defense") and (b) *effectively* shifts the burden on that element to the accused, or (c) otherwise fails to place the burden as to all essential elements of the crime charged upon the state, it is to be deemed *per se* harmful. *See, e.g., Connecticut v. Johnson,* 460 U.S. at 88, 103 S.Ct. at 978 (Blackmun, J., for 4-member plurality) (instruction shifting burden by presumption said to have deprived accused of " 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error' "); *cf. id.* at 98 n. 6, 103 S.Ct. at 983 n. 6 (Powell, J., for 4 members, dissenting) (challenged instruction said not to have shifted burden, hence to be "not comparable to an instruction that can never be harmless—for example, an instruction that fails to inform the jury that it must find guilt beyond a reasonable doubt"); *see also Jackson v. Virginia,* 443 U.S. 307, 320 n. 14, 99 S.Ct.

2781, 2789 n. 14, 61 L.Ed.2d 560 (1979) ("failure to instruct the jury on the necessity of proof beyond a reasonable doubt can never be harmless error"); *Cool v. United States,* 409 U.S. 100, 104, 93 S.Ct. 354, 357, 34 L.Ed.2d 335 (1972) (instruction whose effect was "to require the defendant to establish his *innocence* beyond a reasonable doubt" said to be "plainly inconsistent with the constitutionally rooted presumption of innocence").[3]

II

Considering the issue an open one for which only support and not direct authority can be found in the critical Supreme Court decisions, I come out the same way on an independent consideration of the relevant factors.

Looking first to the subject of the challenged instructions, defendant's alibi evidence, it is settled, and is not here challenged, that because, as a matter of federal law, this "defense" relates to an element of the crime charged, the burden of proof upon it may not constitutionally be shifted to the accused. *Adkins v. Bordenkircher,*

error language in discussing whether the incorporation of a "Sandstrom presumption" in jury instructions required, in the dissenting opinion's terms, "automatic reversal," *Johnson,* 460 U.S. at 95, 103 S.Ct. at 982. But, with the greatest deference, I suggest that the focal point of the actual debate within the *Johnson* Court was only upon the predicate question of constitutional error: whether the presumption *did* effectively relieve the state of the burden of proving intent. And on this, the real point of division between the two opinions appears to be the proper range of record inquiry to determine that predicate question. Justice Blackmun, for the plurality, thought the inquiry should be confined to the instructions themselves, considered as a whole. On that basis he concluded that the instructions must be considered to have been "the functional equivalent of a directed verdict on [the] issue [of intent]." *Id.* at 84, 103 S.Ct. at 976. Justice Powell, writing for the four members of the Court dissenting, thought instead that for the limited purpose of determining whether the presumption—in the manner of a directed verdict—effectively took intent out of issue, the Court could properly take into account not only the instructions but all the evidence of intent that was before the jury. On this basis he thought the state had not been relieved of the burden to prove intent by the presumption considered in this fuller context.

Critically, both the plurality and the dissenting opinions in *Johnson* agree that an instruction that does effectively relieve the state of the burden of proving a disputed element of the crime can never be deemed harmless; they differ only in their assessments of the effect of the presumption there in issue. *See id.* at 97–98 & n. 6, 103 S.Ct. at 983–984 & n.6 (Powell, J., dissenting). Put another way, both agree that at some point burden-shifting instructions become harmful *per se, see id.* at 95 n. 3 (Powell, J., dissenting); they differ only on the point at which this occurs and on the scope of the record inquiry appropriate to determine this. Neither indicated any belief that if such an instructional error occurred, it might then be found harmless *because of the overwhelming evidence of guilt.*

3. In attempting to divine the probable view of a majority of the Court on this unresolved but insistently recurring issue, it cannot be amiss, in light of the division of the Court in *Connecticut v. Johnson,* to ponder the implications of *Engle v. Koehler,* 707 F.2d 241, 246 (6th Cir.1983), *aff'd by equally divided court,* — U.S. —, 104 S.Ct. 1673, 80 L.Ed.2d 1 (1984) (Marshall, J., not participating).

674 F.2d 279, 282 (4th Cir.1982); *cf. Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281.

Looking next to the question of whether the challenged instruction *effectively* shifted the burden to the accused in these cases—again there is no doubt that both did. The patent, unquestionable effect of these instructions was to convey an impression to the jury that the defendant had acquired the burden of disproving his presence at the crime scene (hence his criminal agency in general) by undertaking to prove his presence specifically elsewhere.

These cases are therefore not like those cases in which a proper contextual analysis reveals that the asserted constitutional vice of a single instruction has been dissipated by other specifically curative or otherwise corrective instructions.[4] *Cf. Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *see also Tweety v. Mitchell*, 682 F.2d at 465. Neither are these cases like *Johnson*, where the question of effective burden shifting was at least debatable, and, on my reading, *see* note 2 *supra*, actually the dispositive issue for the Court.

Finally it is plain that the critical element—presence of the accused—was in each of these cases a disputed issue for the jury[5] that was then necessarily decided adversely to the accused by the guilty verdict. These cases are therefore not of the type suggested in the plurality opinion in *Connecticut v. Johnson*, 460 U.S. at 87, 103 S.Ct. at 977, in which a facially erroneous burden-shifting instruction could be found, however, not to have been violative of due process because the element to which it related was—for any number of reasons—not actually in issue, *e.g.*, *Krzeminski v. Perini*, 614 F.2d 121, 125 (6th Cir.1980) (intent conceded by accused), or was manifestly not ultimately decided adversely to the accused, *e.g.*, *Hearn v. James*, 677 F.2d 841, 843 (11th Cir.1982) (erroneous murder instruction on intent; conviction only of manslaughter).

On this threshold analysis of the instructions' effects we therefore have in each of these cases a jury instruction which *effectively* shifted to the accused the burden of persuasion with respect to *an element of the crime charged* whose existence was a *disputed issue* before the jury that was then necessarily denied adversely to the accused. This, it seems to me, establishes

---

**4.** Though the instructions in both cases included accurate general statements placing the proper burden of proof upon the state in respect of all elements of the crime, and recognizing the general presumption of innocence, there is apparently no disagreement within this panel that, construed in total context, the instructions must be assumed erroneously to have shifted to the accused in each case the burden to prove his nonpresence by a preponderance of the evidence. *See Cooper v. North Carolina*, 702 F.2d 481, 483 (4th Cir.1983) (effect of directly conflicting portions of instructions).

In *Fulton*, the court instructed, *inter alia*: "The defendant has the burden of proving an alibi defense and must do so by a preponderance of the evidence, not beyond a reasonable doubt. In order to prove an alibi the testimony must cover the whole time in which the crime by any possibility might have been committed and it should be subjected to rigid scrutiny."

In *Robinson*, in the course of a much more extended and internally ambiguous passage devoted to the alibi defense, the court instructed, *inter alia*: "[A]n alibi is what we call an affirmative defense. It is of course a complete defense if you believe it. Obviously a person who is not

at the scene could not complete the crime. We say it is an affirmative defense because this is the one time in this case where the defendant has the burden of proof.... On the defense of alibi the defense [sic] has the responsibility to satisfy you by a fair preponderance of the evidence that he was not in fact in the store and in fact was somewhere else."

Neither instruction was specifically corrected before the case was submitted to the jury, for the obvious reason that it faithfully applied—albeit ambiguously—then current state law.

**5.** Although there might conceivably have been a question under state law as to whether the admittedly sparse alibi evidence in Fulton's case was minimally sufficient to require a special instruction—i.e., to "raise" the alibi defense—that of course has nothing to do with the question whether for our purposes it was a disputed issue before the jury. Whether or not he was required to give the instruction as a matter of state law, the judge in giving it effectively made it an issue for jury consideration. Presence was of course put in general issue by the not guilty plea.

by a properly limited contextual inquiry that the jury instructions involved an infraction of the basic constitutional right generally recognized in *Winship* and specifically vindicated, for example, in *Mullaney*.

This in turn then squarely raises the issue of whether this constitutional error can nevertheless be found harmless under the *Chapman* test, or whether it must be considered *per se* harmful. Because of the basic nature of the constitutional right involved, general limitations on proper harmless error review, and the primacy of the jury in factfinding, I believe that it must be considered harmful *per se*.

### III

Whether a particular constitutional trial error may ever be found harmless depends not only upon its degree of "grievousness," *see Johnson*, 460 U.S. at 88, 103 S.Ct. at 978 (Stevens, J., concurring in the judgment), but upon its susceptibility to principled harmless error review—that is, review designed and rationally capable of determining the likelihood of actual prejudice traceable to the specific error. The denial of counsel, for example, is constitutional error that may never be deemed harmless, not only because of the basic nature of the right involved, *see Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), but because of the impossibility of attempting fairly to assess the probability or possibility that that error had a specific prejudicial effect in a given trial. *See Holloway v. Arkansas*, 435 U.S. 475, 491, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978) (harmless error analysis where counsel had conflict of interest "would require ... unguided speculation").

A constitutionally erroneous burden-shifting jury instruction must be considered at least equally as grievous as those errors specifically recognized as *per se* harmful, *see Mullaney*, 421 U.S. at 699–701, 95 S.Ct. at 1889–1890, and equally as unsusceptible to principled harmless error

review. The special vice of such an instruction is that it fundamentally taints the whole fact-finding process. In this critical respect it differs from trial errors such as the admission or exclusion of evidence, *see, e.g., United States v. Hastings*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), whose "scope is readily identifiable," *Holloway v. Arkansas*, 435 U.S. at 490, 98 S.Ct. at 1181, and whose practical effect upon a particular trial process can therefore be assessed with some degree of confidence. Because we must assume that juries understand and follow plainly given instructions, *see Johnson*, 460 U.S. at 85 n. 14, 103 S.Ct. at 977, the effect of a burden-shifting instructional error must be taken to have wrenched the fundamental way in which the jury was required by the constitution to assess evidence of guilt. As such, this error plainly falls in the same category as other errors resulting in unconstitutionally tainted fact-finders or basic fact-finding processes that have been authoritatively held on that account to be *per se* harmful. *See Chapman*, 386 U.S. at 23 & n. 8, 87 S.Ct. at 828 (trial without assistance of counsel; trial by biased judge); *id.* at 43–44, 87 S.Ct. at 837–838 (Stewart J., concurring) (trial in community exposed to prejudicial pre-trial publicity; trial by discriminatorily selected jury).

In respect of each of those "never-harmless" errors recognized in *Chapman*, it would be theoretically possible to conclude that because of the overwhelming evidence of guilt even an untainted fact-finder or a specifically untainted trial process would also necessarily have found guilt. The primary reason that this possibility has been thought one not tolerable in those other situations applies with equal or greater force to a constitutionally erroneous burden-shifting instruction: the right violated is one that exists apart from the right not to be convicted except upon a legally sufficient amount of evidence; it is therefore irremediably violated whatever the actual evidence of guilt in the particular case.[6]

---

**6.** In *In re Winship*, 397 U.S. at 364, 90 S.Ct. at 1072, the Court had this to say about the tran-

scending importance—existing apart from the sufficiency of evidence of guilt—of the due pro-

See Jackson v. Virginia, 443 U.S. at 320 n. 14, 99 S.Ct. at 2790 n. 14 ("[A] defendant whose guilt was actually proved by overwhelming evidence would be denied due process if the jury was instructed that he could be found guilty on a mere preponderance"); United Brotherhood of Carpenters & Joiners v. United States, 330 U.S. 395, 410, 67 S.Ct. 775, 783, 91 L.Ed. 973 (1947) ("[W]here the evidence ... is well-nigh conclusive and the court fails to give a reasonable doubt instruction ... [i]t could not be said that the failure was harmless error").

Finally, finding a trial error harmless (whether or not of constitutional dimensions) solely on the basis of the overwhelming weight of the evidence—the only basis upon which harmlessness of a burden-shifting instruction could be rested—has been authoritatively condemned as an impermissible function of harmless error analysis. In Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946), the Court pointed out why:

> The question is not [whether the jury was] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not one's own, in the total setting.

See also R. Traynor, The Riddle of Harmless Error, 13.[7]

The fact that only by this inappropriate appellate process could an unconstitutional burden-shifting instruction theoretically be found harmless [8] is but further reason why it is an error that must simply be deemed

---

cess right not to be convicted "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime ... charged":

> "[U]se of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in application of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty."

As Mullaney and its progeny have made plain, this right is effectively denied by instructional error that relieves the state of this burden of proof in respect of any element of the crime by shifting it to the accused. To allow such an error to be found harmless would convert the right merely into one to have guilt adjudged under the proper standard of proof except where the evidence was, in the eyes of an appellate court, sufficiently "overwhelming." That, I submit, would fundamentally dilute the constitutional right recognized in Winship and directly vindicated in Mullaney in both of which cases it is highly likely that the evidence of guilt might also have been thought "overwhelming" by a reviewing court.

7. Only within very narrow bounds may the weight of the evidence properly be considered by an appellate court in assessing the possible harmlessness of error. With respect to trial errors, such as the admission or exclusion of evidence, whose "scope is readily identifiable," and whose possible effect upon the verdict may therefore be rationally assessed, the weight of the evidence may be taken into account in assessing whether the case was a close one in which the error may have tipped the balance. See United States v. Nyman, 649 F.2d 208, 212 (1981). This must be distinguished from the inappropriate process, frequently confused with it, of assessing whether, disregarding the error, there was ample evidence to support the verdict. Id.

8. With all respect, the majority's harmless error analysis is precisely of this type and well illustrates the reason why the instructional errors here must be deemed per se harmful if the basic constitutional right is to be secured.

In demonstrating the harmlessness of error in Robinson's case, for example, the majority has considered it necessary to declare, inter alia, that: "the fingerprints are conclusive"; "Robinson was in the store; the alibi was a fabrication beyond any conceivable doubt"; there was no "articulable possibility that the alibi could be true."

I agree that as a practical matter only by this sort of record analysis could this instructional error be declared harmless beyond a reasonable doubt. I further agree that these factual conclusions are the most rational ones that could be drawn by a factfinder charged with first instance adjudication on the records we review. But I do not believe that this is a proper function of harmless error review by an appellate court, whatever the degree of error, and particularly when, as here, the error is of constitutional dimension.

never harmless. *Cf. United Brotherhood of Carpenters & Joiners v. United States,* 330 U.S. 395, 410, 67 S.Ct. 775, 783, 91 L.Ed. 973 (1947); *Bollenbach v. United States,* 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

## IV

In sum, I would hold that in assessing a claim that a jury instruction unconstitutionally shifted to an accused the burden of proof in a criminal case, the only question is whether it had *that* effect. If found to have that effect, I would treat the error as *per se* harmful—as not susceptible to harmless error analysis.

I would further hold that in determining whether a challenged instruction were unconstitutional, inquiry is properly limited to the questions: (a) whether the instruction related to an element of the crime charged within contemplation of *Mullaney* and *Patterson;* (b) whether, viewed in total context, it effectively shifted the burden to the accused; and (c) whether the element to which it related was a disputed issue of

fact that was necessarily determined adversely to the accused by the verdict of guilty. If all three of these predicates were established, I would hold the particular instruction unconstitutional, and the convict entitled to have the challenged conviction set aside without further inquiry.[9]

In each of the cases before us I would, in accordance with these principles, find the challenged instructions unconstitutional on the basis that all three predicates were indisputably established, and reverse with directions to issue the writs conditioned upon the state's right to re-try the petitioners within reasonable times.[10]

9. Under this approach, the only and dispositive inquiry is whether the instructional error *was* unconstitutional. The identified predicates establish the content and contextual limits of that inquiry. In my view, the limits so defined give the maximum flexibility that is possible for an inquiry designed effectively to protect both the interests of the state in the finality and invulnerability to purely technical attacks of its judgments, and the constitutional right of the accused not to be convicted by a jury except under the proper standard of proof.

This approach concededly is at odds—though to some extent probably only semantically— with that taken by other courts which in assessing these predicates have done so in "harmless error" terms. *See, e.g., Hearn v. James,* 677 F.2d 841, 843 (11th Cir.1982); *see also Johnson,* 460 U.S. at 90, 103 S.Ct. at 979 (Powell, J., dissenting) (semble).

There is, however, a sound conceptual basis both for confining the inquiry in this way and for insisting that it relates only to the *existence* of constitutional error, not to its harmlessness. The basis is that the due process inquiry as to trial error—to determine whether it is of constitutional dimension—is itself aimed at deciding whether the error resulted in "fundamental unfairness." Such an inquiry seems—both concep-

tually and practically—essentially to subsume any further question of "harmlessness." *See Krzeminski v. Perini,* 614 F.2d at 125. More important than conceptual tidiness however is a practical effect—that by this means the inquiry is stopped short of any assessment of the weight of the evidence of guilt as a possible basis for finding the "error" harmless.

10. Of undoubted concern in this, as in all cases of collateral federal attacks on state convictions, is the spectre of opening the doors on unknown numbers of comparably flawed convictions. The concern is of course magnified where, as here, the constitutional flaw alleged is one based upon a long-standing, previously unchallenged state rule which presumably was followed in many cases. The concern is one not lightly to be dismissed, but it is one that cannot of course control decision. *Cf., e.g., Mullaney, Sandstrom, Johnson.* Questions of retroactivity, *cf. Hankerson v. North Carolina,* 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1976); of staleness, *see* 28 U.S.C. § 2254, Habeas Rule 9(a); *see also id.* (proposed amendment Aug. 19, 1983); and of procedural default, *see Hankerson,* 432 U.S. at 244 n. 8, 97 S.Ct. 2339 at 2345 n. 8, would of course control the ultimate extent of the precedential consequence.