James E. DAVIS, Appellant,

v.

Harry L. ALLSBROOKS, Warden of the Northhampton Co. Prison; State of North Carolina, Appellees.

No. 84–6654.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1985.

Decided Nov. 27, 1985.

George Daly (Eben Rawls; Haywood, Carson & Merryman, Charlotte, N.C., on brief), for appellant.

Richard N. League, Sp. Atty. Gen. (Lacy H. Thornburg, Atty. Gen., Raleigh, N.C., on brief), for appellees.

Before PHILLIPS, CHAPMAN, and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

Appellant James E. Davis was convicted of first degree murder in North Carolina state court. After exhausting the state appeals process, *see State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982), he sought a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the district court for the Western District of North Carolina. Appellant alleged constitutional violations with respect to his confession to police officers, the admission of evidence, the closing argument of the prosecutor, and the trial judge's instructions. The district court found no basis for granting the writ. We affirm.

I

The body of Myrtle Wilson Wilder was found in her Asheville, North Carolina home on August 16, 1980. Though she was fully clothed, her underpants were around her knees when her body was discovered. The evidence shows that Mrs. Wilder's murder was particularly brutal. She had suffered seven or eight stab wounds to the abdominal area, some as deep as five or six inches. Her neck was broken, her face was bruised and scraped, and her wrists slashed. Further investigation revealed signs of strangulation, possibly caused by a whiplash-type injury.

Police investigation of the crime proved unproductive for several weeks, until Officer Lee Warren received information that led him to consider Davis as a possible suspect. The officer left a note at the

house of appellant's grandmother asking appellant to come see him. Two days later, on September 4, 1980, appellant came to the station to speak to detectives.

Police gave Davis his *Miranda* warnings and he signed a written waiver of his rights. For approximately two hours, from 6:00 p.m. to 8:00 p.m., detectives questioned appellant concerning Mrs. Wilder's murder. Davis gave an exculputory statement, and agreed to take a polygraph test. When the equipment was set up for the test, Davis asked what the questions would be. Upon hearing the questions, he changed his mind and refused to take the test. The detectives asked appellant if he would return around 10:00 p.m., after the parties took a dinner break. He agreed, and the detectives drove him home.

When they had finished eating at approximately 10:00 p.m., the detectives radioed the station and learned that appellant had not yet arrived. Aware that the doors leading to detectives' offices were locked by that time, the detectives drove toward appellant's house to see if he was out walking. When they found Davis near his house, they offered him a ride, which he accepted by getting into the back seat. The criminal investigation was not mentioned during the ride to the station. In fact, the evidence shows that conversation focused on the latest hairstyles.

At the station, the detectives and appellant went to a 24′ × 12′ carpeted, air-conditioned conference room, where Davis was again advised of his *Miranda* rights both orally and in writing. He waived his rights in writing. Shortly after questioning resumed, appellant told the detectives that he no longer wanted to talk about the case. The detectives continued to question Davis, and placed pictures of the crime scene in front of him. Appellant did not want to look at the pictures, became visibly upset, and started to cry. At his request, he was taken to the bathroom and escorted back to the conference room by one of the detectives.

Upon appellant's return, questioning about the death of Mrs. Wilder resumed. At some point he was again escorted to the bathroom and back. Then, appellant stated that he needed to talk about what had happened, that he had trouble sleeping and could only see Mrs. Wilder's face. Appellant gave a detailed statement to the detectives confessing to the murder of Mrs. Wilder. The detectives obtained a warrant and placed Davis under arrest.

Appellant was tried and convicted in state court, receiving life imprisonment. He asserts four grounds which he believes warrant issuance of the writ: 1) that his confession was obtained in violation of his *Miranda* rights, 2) that the trial court's instructions to the jury impermissibly shifted the burden of persuasion to appellant, 3) that the prosecutor's closing argument denied him a fair trial, and (4) that the victim's diary was improperly admitted into evidence.

## II

Appellant first asserts that his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) were violated because detectives continued to question him about Mrs. Wilder's death after he indicated that he no longer wanted to talk. We conclude, however, that appellant was not in custody at the time he was questioned. *Miranda*, therefore, is inapplicable.

It is undisputed that appellant was given *Miranda* warnings on several occasions, and that he signed at least two written waivers of his rights. It is also undisputed that he indicated that he no longer wanted to talk, and that police continued to question him despite his request. *Miranda* clearly prohibits such police conduct where it applies, *see* 384 U.S. at 473–74, 86 S.Ct. at 1627, but *Miranda* applies only when an individual is subject to custodial interrogation. *See California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48

L.Ed.2d 1 (1976); *United States v. Stanley,* 597 F.2d 866, 869 (4th Cir.1979).

The Supreme Court has articulated the standard by which "custody" is to be judged. "[T]he ultimate inquiry," the Court has noted, "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520, *quoting Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714. *See also Moore v. Ballone,* 658 F.2d 218, 225 (4th Cir.1981). The issue does not turn on the subjective evaluation of the situation by the defendant or the police officers; instead, the test is an objective one. "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* — U.S. —, —, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984). Custody does not result merely because an individual is questioned in a "coercive environment," *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714, or is the "focus" of a criminal investigation. *Beckwith,* 425 U.S. at 349, 96 S.Ct. at 1617.

Applying these guidelines to the facts before us, and mindful of the actual holdings in cases such as *Mathiason* and *Beheler,* we find that appellant was not in "custody" for *Miranda* purposes. Here, as in *Mathiason,* appellant's initial contact with police was the result of his voluntary response to their request to speak with him. The total absence of any coercion occasioned by the police note is made evident by the fact that Davis felt free to wait two days before presenting himself at the station.

Conditions at the station were as informal as one could expect. Both sessions took place in large, carpeted, air-conditioned rooms, and appellant was given a soft drink. Though the first session lasted approximately two hours, it was not a marathon session designed to force a confession. The detectives took a dinner break at a reasonable hour, gave appellant a ride home, and agreed to meet later at a mutually convenient time. Appellant apparently understood that he was free to reject police requests for information; after initially agreeing to take a polygraph, he changed his mind and refused. Unless we are to conclude that custody results "simply because the questioning takes place in the station house," *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714, we see nothing on these facts to warrant a finding that appellant was in custody.

Nor do we find it significant that appellant was given a ride to the police station after the break in questioning. The detectives drove to appellant's neighborhood to see if he was out walking only after they discovered that he had not arrived at the station house by the agreed time. Appellant was offered a ride, not ordered into the car, and he accepted by voluntarily getting into the car. The investigation was not discussed during the ride. In light of the detective's previous actions—such as stopping questioning for dinner and giving appellant a ride home—we find that the ride back to the police station was insufficient to establish custody and coercion.

A similar conclusion obtains with respect to the fact that police twice escorted appellant to the bathroom and back. The first occasion may be explained by the fact that appellant was unfamiliar with the station house and may not have known his way to the bathroom or back to the conference room. At the time of the second trip, appellant was upset and the detectives' unwillingness to leave him alone at that time was understandable. Whatever level of coercion may have been inherent in this police escort is insufficient for us to conclude that appellant was in custody, given the other circumstances surrounding his encounter with the police.

Appellant also asserts that the detectives' failure to tell him he was free to go supports the conclusion that he was in custody. Though informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, *see e.g. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714; *Stanley,* 597 F.2d at 869, it is

not a talismanic factor. *See e.g., Berkemer v. McCarty,* —— U.S. ——, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Where, as here, the entire context indicates a lack of custody, failure to inform defendant of his status is not dispositive.

■ Finally, we address the question of whether the reading of *Miranda* warnings to a suspect should by itself create custody. We think it inadvisable to impose so absolute a rule. *Cf. Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). To hold that the giving of *Miranda* warnings automatically disables police from further questioning upon a suspect's slightest indication to discontinue a dialogue would operate as a substantial disincentive to police to inform suspects of their constitutional protections. It would convert admirable precautionary measures on the part of officers into an investigatory obstruction.[1]

We recognize that any encounter with police may be both anxious and unpleasant no matter what kind of treatment the individual receives. We do not seek to place upon these sessions an amiable gloss. We emphasize, however, that the totality of the circumstances here demonstrates a natural persistence on the part of police together with a commendable sense of restraint. Such loose-reins behavior is far removed from "the incommunicado interrogation in a police-dominated atmosphere" which *Miranda* properly deplored. 384 U.S. at 445, 86 S.Ct. at 1612.

### III

■ In instructing the jury on the elements of first degree murder, the trial court said:

If the state proves beyond a reasonable doubt or it is admitted that the Defendant intentionally killed Myrtle Wilson

Wilder with a deadly weapon, ... *the law implies first that the killing was unlawful, and second, that it was done with malice.*

Appellant objects to the italicized portion of the charge. He asserts that the trial court's instruction to the jury on malice unconstitutionally shifted the burden of persuasion to him, in violation of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). We reject this contention, and hold that a state may legitimately shift a burden of production on an element of the crime to the defendant, as North Carolina has done, so long as the presumed fact is rationally connected to a proven fact. *County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).[2]

It is clear that North Carolina law shifts only a burden of production on the element of malice to the defendant, rather than a burden of persuasion. *State v. Hankerson,* 288 N.C. 632, 220 S.E.2d 575 (1975), *rev'd on other grounds,* 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977). The Supreme Court of North Carolina explained the distinction in *State v. Simpson,* 303 N.C. 439, 451; 279 S.E.2d 542, 550 (1981):

The effect of the presumption is to impose upon the defendant the burden of going forward with or producing some evidence of a lawful reason for the killing or an absence of malice; *i.e.,* that the killing was done in self-defense or in the heat of passion upon sudden provocation. The state is not required to prove malice and unlawfulness unless there is some evidence of their nonexistence, but once such evidence is presented, the state must prove these elements beyond a reasonable doubt.

■ Regardless of the content of state law, we must normally examine the trial court's instructions to see what burden was

---

1. There are, of course, circumstances where a clash of wills over a suspect's desire to remain silent would create custody through overbearing police behavior. We discern no such circumstances here.

2. To raise a *Mullaney* problem, the issue involved in the disputed instruction must be an

element of the crime. Compare *Mullaney* with *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Malice is clearly an element of first degree murder under North Carolina law. *See State v. Hutchins,* 303 N.C. 32, 279 S.E.2d 788, 802 (1981).

*actually* shifted. *See Sandstrom v. Montana,* 442 U.S. 510, 514–19, 99 S.Ct. 2450, 2454–56, 61 L.Ed.2d 39 (1979). For reasons explained below, however, we find it unnecessary on the facts of this case to dissect the court's instructions and we evaluate only the validity of the state law presumption shifting the production burden to the defendant.

*Sandstrom* required close examination of a judge's instructions in a context where the precise effect of the instruction was critical. The court examined the instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts," *id.* at 513, 99 S.Ct. at 2453, where lack of intent was "the lone element of the offense at issue in Sandstrom's trial." *Id.* at 521, 99 S.Ct. at 2458. Because the Court found that the jury may have interpreted the instruction as either a conclusive presumption or a persuasion burden shifting presumption, it held the instruction unconstitutional. The Court's concern over jury confusion is explained by the fact that the confusion may have made a difference in the outcome of the trial; a production burden had clearly been met by the defendant, so the heavier burdens to which he was potentially subjected may have been dispositive on the critical issue.

■ The present case presents a wholly different situation. Here, it matters not whether the jury interpreted the instruction as shifting a burden of production or some higher burden, because the question of malice was simply not at issue in the case. The controverted question was rather one of who committed the crime. We need not determine what precise burden was shifted by the instructions, because appellant met no burden whatsoever on the malice question. *See Fulton v. Warden,* 744 F.2d 1026, 1037 (4th Cir.1984) (Phillips, J., dissenting) (recognizing that presence of a disputed issue is critical in *Mullaney* question). Instead, we need only decide the validity of the clear rule of state law shifting the burden of production to the defendant. If this rule of law is valid, the actual impact of the court's instructions is irrelevant when a defendant has not met even the burden of production, for there is no danger that he may have suffered from failure to meet only the higher, unconstitutional requirements.

Though the Supreme Court has intimated that a shift in the production burden is permissible, *see, e.g., Mullaney,* 421 U.S. at 701 n. 28, 702–03 n. 30, 95 S.Ct. at 1891 n. 28, 1891 n. 30; *Patterson,* 432 U.S. at 230–32, 97 S.Ct. at 2337–38 (Powell, J., dissenting), the question is still an unsettled one. *See Francis v. Franklin,* —— U.S. ——, —— n. 3, 105 S.Ct. 1965, 1971 n. 3, 85 L.Ed.2d 344 (1985). We hold that a state may constitutionally shift the burden of production to a criminal defendant so long as the presumption relied upon meets the standards of *County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

■ Shifting a production burden simply does not involve the same concerns addressed by the Court in *Mullaney. Mullaney* is grounded in the standard of proof "beyond a reasonable doubt" required by *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). A burden of production shift, however, does not affect that requirement in any way. The defendant need not meet any persuasion burden at all, but instead must only introduce some evidence to dissipate the presumption and require the state to prove the element of the crime beyond a reasonable doubt. Such a shift "has little, if any, impact on the substantive relation between the state and the criminal accused. Instead, placing the burden of production on the defendant is an economical way to screen out issues extraneous to the case at hand and thus to promote efficient litigation." Jeffries & Stephan, *Defenses, Presumptions, and Burden of Proof in the Criminal Law,* 88 Yale L.J. 1325, 1334 (1979). *See also, Mullaney,* 421 U.S. at 703 n. 31, 95 S.Ct. at 1829 n. 31 ("Shifting the burden of persuasion to the defendant places an even greater strain upon him [than shifting the burden of production] since he no longer need only present some evidence with respect to

the fact at issue; he must affirmatively establish that fact.") To invalidate production burden shifting presumptions would require the state to disprove convincingly every possible defense even though the defense was not raised at trial. We refuse to establish such a requirement, and evaluate this presumption under the *Allen* standard.

 We have no difficulty concluding that the presumption relied on in this case satisfied the requirement of *Allen* that the fact presumed be rationally connected to a proven fact. The proven facts in this case, showing a brutal and vicious murder, clearly allow the presumption of malice absent any evidence introduced by the defendant to put malice at issue. We accordingly reject appellant's challenges to the jury instructions, and find no constitutional infirmity in a presumption of malice from proof of intentional killing with a deadly weapon that shifts to a defendant no more than a burden of production which was never met.

## IV

In his closing argument, the prosecutor told the jury:

> You know, this case is completely uncontradicted. The facts in this case are completely uncontradicted. When I took this job over two years ago, I came into this Courtroom, put my hand on this Bible right over there, and I took an oath that I would see that justice was done in this country. Every one of these officers in this courtroom are sworn law enforcement officers. Ladies and gentlemen, we have brought the truth into this courtroom. I ask, who is being honest with you? Who is being honest with you?

App. at 237. Appellant contends that this statement denied him the right to a fair trial by vouching for the credibility of witnesses and the prosecutor's own honesty. He also questions the propriety of a comment by the prosecutor on the hypothetical value of the testimony of an uncalled witness.[3] Appellant did not object to either comment at trial but raised the issue for the first time on appeal.

 The government, while responding on the merits,[4] argues mainly that substantive review of appellant's allegation is barred by *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), because appellant's failure to object at trial constituted a procedural default. Under North Carolina law, "when counsel makes an improper remark in arguing to the jury, an exception must be taken before the verdict, or the impropriety is waived." *State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1984); *State v. Morgan*, 299 N.C. 191, 261 S.E.2d 827 (1980). We agree that *Wainwright* governs this situation and, finding no cause for the failure to object, hold that the default constituted an independent state procedural ground precluding federal habeas review.

In considering appellant's arguments on appeal, the North Carolina Supreme Court found the issue procedurally barred due to appellant's failure to object. *See State v. Davis*, 290 S.E.2d at 587. Had the court relied exclusively on this state procedural ground, *Wainwright* would clearly bar federal habeas review absent cause and prejudice. *See Wainwright*, 433 U.S. at 82, 97 S.Ct. at 2504. *See also, Engle v. Isaac*, 456 U.S. 107, 124–29, 102 S.Ct. 1558, 1570–72, 71 L.Ed.2d 783 (1982). The court, however,

---

**3.** Detective Lee Warren, one of the two primary investigators in the case, did not testify at trial. The defense claimed that the State was covering up evidence by the absence of Detective Warren. *See* App. at 228–31. Appellant now objects to the prosecutor's statement that "Detective Warren couldn't have added one iota to this thing." App. at 247.

**4.** The government claims the prosecution's closing remarks were in response to assertions of

defense counsel that the state was engaged in a scheme to withhold valuable evidence from the jury. As such, the government contends the remarks did not violate the standards set forth in *United States v. Young*, —— U.S. ——, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). As we hold federal review of the issue foreclosed on procedural grounds, we obviously express no view on the merits of this question.

went on to discuss the merits of appellant's claim, concluding that "[e]ven had the argument of the prosecutor been properly objected to and a timely exception taken, the remarks complained of were not so prejudicial as to require a new trial." *Id.,* 305 N.C. at 422, 290 S.E.2d at 587. The issue, therefore, is "whether express reliance on a procedural bar is undone as a procedural default when the state court also addresses the merits." *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435, 439 (3d Cir.1982).

A majority of circuits considering the issue have concluded that *Wainwright* applies whenever a state court relied on a procedural default regardless of whether it ruled alternatively on the merits. *See McCown v. Callahan,* 726 F.2d 1 (1st Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 139, 83 L.Ed.2d 78 (1984); *Phillips v. Smith,* 717 F.2d 44 (2d Cir.), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984); *Hall v. Wainwright,* 733 F.2d 766 (11th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2346, 85 L.Ed.2d 862 (1985); *Farmer v. Prast,* 721 F.2d 602 (7th Cir.1983); *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435 (3d Cir.1982). Some circuits have required simply that the state court rely primarily or substantially on the procedural bar for *Wainwright* to apply. *See Hockenbury v. Sowders,* 620 F.2d 111, 115 (6th Cir.1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 367 (1981); *Dietz v. Solem,* 640 F.2d 126, 131–32 & n. 1 (8th Cir.1981). Others, however, hold that a federal court may reach the merits of the habeas claim whenever a state court has discussed the merits. *See Hux v. Murphy,* 733 F.2d 737 (10th Cir.1984); *Thompson v. Estelle,* 642 F.2d 996, 998 (5th Cir.1981); *Bradford v. Stone,* 594 F.2d 1294, 1296 n. 2 (9th Cir.1979). Apparently, the Fourth is the last regional circuit to address the issue fully.[5]

■ We hold that *Wainwright's* cause and prejudice standard applies on federal

habeas review whenever a state court finds procedural default, regardless of whether it alternatively discussed the merits. The policies that prompted the holding in *Wainwright* are equally applicable whenever a state court relies on its procedural rule, and are not vitiated merely because a discussion of the merits provides an alternative ground. *See Phillips,* 717 F.2d at 48–49.

The *Wainwright* court acted in part out of concern for federalism and comity. It noted that the state procedural rule at issue deserved great respect because it was "employed by a coordinate jurisdiction within the federal system." 433 U.S. at 88, 97 S.Ct. at 2507. *See also Engle,* 456 U.S. at 128, 102 S.Ct. at 1572. The procedural rule deserves no less respect because it is cast in the form of an alternative holding. "[A]n alternative holding has the same force as a single holding; it is binding precedent." *Zelinsky,* 689 F.2d at 440. A state court's discussion of the merits in the alternative does not detract from the validity of its procedural ruling. It merely reflects the natural tendency of a court to marshal every argument possible in support of its position. As noted in *Zelinsky,* 689 F.2d at 440, "decisions on procedural grounds are not as satisfying as decisions on the merits, and it is understandable that a court would want to show that it does not think its reliance on a procedural rule is causing any great injustice." The understandable tendency of courts to hold in the alternative simply does not affect the validity of state procedural rules or the federalism concerns that flow from their existence.

Of course, it is clear after *Wainwright* that the state appellate court can rely exclusively and rigidly on procedure to avoid the potential weakening of its contemporaneous objection rule. We would be loathe, however, to encourage exclusive reliance upon procedural forfeitures as a means of shielding state convictions from federal col-

---

**5.** In *Briley v. Bass,* 750 F.2d 1238, 1246 n. 13 (4th Cir.1984), this court assumed, without deciding, that an alternative finding on the merits by the state court allowed a federal habeas court to reach the merits. We address the issue squarely now.

lateral attack. Rather, it is desirable to encourage the state appellate courts to apply their procedural rules in a way that exhibits an awareness of the fundamental fairness of the criminal process. Federal courts do no less when reviewing for "plain error" on direct criminal appeal, despite the presence at trial of a procedural default, Fed.R.Crim.P. 52(b). *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

In noting that the prosecutor's remarks "did not stray so far from the bounds of propriety as to require action by the trial court *ex mero motu,*" *State v. Davis,* 290 S.E.2d at 587, the North Carolina Supreme Court appeared to review the trial proceeding under a standard akin to "plain error." While our holding in no way depends upon whether the alternative holding of the state appellate court on the merits is on "plain error" grounds or otherwise, we note simply the inappropriateness of discarding *Wainwright* because state appellate courts frequently undertake to review in the same manner authorized for the federal circuits. Moreover, review for "plain error" on state appeal may not involve "the detailed examination of federal law and federal cases often necessary to decide a specific question of federal law," *McCown v. Callahan,* 726 F.2d at 3. Habeas review in this situation would thus be without the benefit of mature state consideration of the federal question.

*Wainwright* is specifically designed to safeguard valid state interests served by a contemporaneous objection rule. 433 U.S. at 88–90, 97 S.Ct. at 2507–08. The Court found respect for this rule justified on several grounds: it increases the accuracy of factual determinations underlying constitutional questions, *id.* at 88, 97 S.Ct. at 2507, it contributes to finality in criminal litigation, *id.* at 88–89, 97 S.Ct. at 2507, it prevents "sandbagging" on the part of defense lawyers, *id.* at 89–90, 97 S.Ct. at 2507–08, and it serves to make the trial of a criminal case in state court "a decisive and portentous event," *id.* at 90, 97 S.Ct. at 2508. Were we to hold that state appellate discussion of the merits makes *Wain-*

*wright* inapplicable, these benefits of the rule would be lost where state courts, for whatever reason, felt an obligation to discuss the merits in addition to the procedural bar. The issue would then be open to collateral review without the benefit of factual inquiries at trial, finality interests would be sacrificed, "sandbagging" would again pay returns for attorneys and clients willing to take the risk, and the concentration of efforts on trial would be lessened. While *Wainwright* spoke of the value of enabling state trial judges to consider promptly the suppression of unlawfully obtained evidence, the state interests behind a rule of contemporaneous objection to improper remarks at closing argument are no less valid. Here prompt objection would permit the trial judge to cut off improper remarks at the outset, to offer the jury a curative instruction, or, at worst, to require a new trial while the evidence was still fresh.

For the reasons stated above—to vindicate federalism concerns, to preserve flexibility and thoroughness in state court adjudication, and to ensure that the goals of state procedural rules are attained—we hold that federal habeas review is barred absent a finding of cause and prejudice where a state relies on a procedural bar, regardless of alternative discussion of the merits.

We find no cause on these facts for the failure to object to the prosecutor's comments. Appellant advances no justification for this failure, and none is apparent from the record. Because the "cause and prejudice" test is framed in the conjunctive, the absence of cause makes unnecessary an inquiry into prejudice. Accordingly, we find federal habeas review of this issue foreclosed by *Wainwright.*

## V

Finally, appellant contends that the admission into evidence of the victim's diary violated his rights of confrontation. Applying the standards of *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39,

65 L.Ed.2d 597 (1980), we find no error in the entry of this item into evidence. The declarant Mrs. Wilder was clearly unavailable due to her death. Moreover, the diary bears adequate "indicia of reliability" to ensure its truthworthiness. Entries were in the victim's handwriting, and the journal was presumably regularly kept. The writings were unrelated to appellant and dealt with subjects about which the victim had no discernible reason to lie.

## VI

We have considered petitioner's allegations of error, and find them to be without merit. Accordingly, the judgment of the district court is

AFFIRMED.

JAMES DICKSON PHILLIPS, Circuit Judge, specially concurring:

I concur in the result and join fully in all of the court's opinion save Part III dealing with North Carolina's presumption of malice and unlawfulness in murder trials. As to that, I agree with the court's ultimate conclusion that the presumption's use here was not unconstitutional, and with much of the court's rationale in reaching that conclusion. I write separately, however, to express an understanding on this issue that may be directly at odds with portions of the majority opinion and that undoubtedly sees in the issue a wider range of problems than is considered in the majority opinion.

## I

As the majority indicates, the most critical question presented by the challenged instruction is the hitherto unanswered one of the constitutionality of state procedures that place upon the defendant a burden of producing "some" evidence respecting elements of the crime of murder, at peril of having invoked against him a mandatory presumption respecting those elements for use by the jury. As further indicated, the Supreme Court has expressly reserved decision on the specific question, see *Francis v. Franklin*, —— U.S. ——, —— n. 3, 105 S.Ct. 1965, 1971 n. 3, 85 L.Ed.2d 344 [1] (1985).

Resolution of this question presents serious problems of reconciling the challenged instruction with Supreme Court decisions respecting the use of the type presumption it incorporated. I believe that this can be done conformably with underlying due process concerns. But I believe it can only be done conformably with Supreme Court precedents by considering the jury instruction itself as merely the culminating element in a wider jury control device that includes a prior placement upon the defendant of an unmet burden of producing evidence. Only because the Supreme Court has not directly considered the use of this type presumption in that wider context do I believe it may be upheld faithfully to the Court's precedents.

To permit analysis in that wider context, it is necessary first to understand the total state procedural device within which the defendant's production burden and the jury instruction reflecting whether the burden has been carried are interrelated elements. This requires looking beyond the instruction itself, but that is the convenient starting point.

1. As stated by the *Francis* Court, the question that has been reserved is "whether a mandatory presumption that shifts only a burden of production to the defendant is consistent with the Due Process clause." This parallels other references to the procedural device by the Court, e.g., that in *County Court of Ulster County v. Allen*, 442 U.S. 140, 158 n. 16, 99 S.Ct. 2213, 2226 n. 16, 60 L.Ed.2d 777 (1979): "[t]o the extent that a presumption imposes an extremely low burden of production, [etc.]."

My statement of the reserved question in somewhat different form, emphasizing placement of the production burden as the focal, originating element in the overall procedural device, does not I think, reflect any but a semantic difference. A chicken-or-egg situation is involved. Whether the presumption "imposes" or "shifts" the burden of production, or whether placement of the burden of production, followed by failure to carry it, "raises" the presumption, has no significance in analyzing the constitutionality of the total evidentiary device. Certainly I have not intended to recast the issue in a form substantively different from that actually contemplated by the Court.

That instruction simply tells the jury that if the jury is persuaded beyond a reasonable doubt that the defendant killed the victim intentionally with a deadly weapon, "the law presumes" that the killing was done "with malice" and "unlawfully." In terms of the *Allen* Court's analysis, this is a "mandatory" presumption that "told" the jury that it *"must* find the elemental fact[s] [here malice and unlawfulness] upon proof [convincing to it beyond a reasonable doubt] of the basic fact[s] [here, intentional killing with a deadly weapon]." *County Court of Ulster County v. Allen*, 442 U.S. 140, 157, 99 S.Ct. 2213, 2225, 60 L.Ed.2d 777 (1979) (emphasis in original).

Unmentioned to the jury, because it had nothing to do with the jury's fact-finding function, is the legal basis for this mandatory presumption: that the defendant had failed to present even "some evidence" to rebut the presumed connection between the two facts, *i.e.*, had failed to carry a burden of production to "come forward with some evidence" that would rebut the presumption.

This burden of production obviously therefore does not derive from the jury instruction itself. Neither is it a feature of the state statutes defining the crime at issue. *See* N.C. Gen. Stat. § 14–17 (murder). Rather, it is wholly a creature of state decisional law tracing back to procedures developed in common law murder prosecutions. *See State v. Hankerson*, 288 N.C. 632, 220 S.E.2d 575, 585–86 (1975). It is to that decisional law, therefore, that one must turn to find the nature and operation of this production burden as a critical component of the total jury-control device. *Cf. Allen*, 442 U.S. at 158 n. 16, 99 S.Ct. at 2226 n. 16 (recourse to statutes and cases may be required to determine what kind of presumption is involved).

The overall nature and operation of the North Carolina procedural device is best explained in two well-considered post-*Mullaney* opinions of the Supreme Court of North Carolina, *Hankerson*, 220 S.E.2d at

588–89 (Exum, J.) (describing operation that would in future avoid *Mullaney* unconstitutionality) and *State v. White*, 300 N.C. 494, 268 S.E.2d 481, 485–89 (1980) (Exum, J.) (elaborating on *Hankerson* presumption in light of *Sandstrom* and *Allen* and applying general principles of latter two cases to another common law presumption). From *Hankerson* and *White*, the following emerges.

Under North Carolina law, "malice" and "unlawfulness" are elements of the crime of murder in the second degree. The state, therefore, under *Mullaney*, has the burden of convincing the jury beyond a reasonable doubt of the existence of these two elements, along with the other elements of the crime. This is a burden of persuasion that remains throughout on the state. Nevertheless, to hold these elements fully in direct issue for jury resolution *unaided by the presumption*, a defendant has the burden of producing some evidence that tends to negate the existence of the elements. As to malice, this would be "some" evidence that any killing done was done "in the heat of passion on sudden provocation." As to unlawfulness, it would be "some" evidence that any killing done was in self-defense.[2] Failure to carry that production burden invokes the presumption, whose effect may then be submitted to the jury for use in deciding whether the elements of malice and unlawfulness have been proven beyond a reasonable doubt.

These respective burdens are implemented in jury trials by the traditional device of instructions to the jury that define and submit the disputed factual issues that remain for resolution under controlling substantive principles and the appropriate burdens of persuasion. The first step in administering this jury control device therefore precedes any instruction to the jury about its factfinding function. The judge first decides as a matter of law whether on all the evidence the defendant's slight burden of production has been carried. If he determines that it has not been carried, he

2. Under North Carolina law, heat of passion provocation at least reduces the homicide to voluntary manslaughter; self-defense exonerates. *See Hankerson*, 220 S.E.2d at 589.

does not tell the jury this, he simply tells them that if the evidence before them (including of course the unremarked non-evidence of "heat of passion" or self-defense) persuades them beyond a reasonable doubt that the defendant killed intentionally with a deadly weapon, then they must also find that beyond a reasonable doubt he killed with malice and unlawfully (the "law presumes" the one from the other). Failure to carry that burden of production thus "raises" the presumption.

On the other hand, if the judge determines that some evidence of heat of passion or self-defense has been adduced—that the burden of production has been carried—again he does not specifically tell the jury so. But because the effect is to "dissipate" (or prevent the invocation of) the mandatory presumption, he simply does not submit it for use by the jury in reaching a verdict. In this circumstance he may, however, in instructing the jury on the malice and unlawfulness elements, tell the jury that the evidence of intentional killing with a deadly weapon may, but need not, give rise to an inference of malice and unlawfulness as defined elements of the crime. *See Hankerson*, 220 S.E.2d at 589 ("mandatory presumption ... disappears but the logical inferences from the facts proved remain in the case to be weighed against [the rebutting] evidence").[3]

From this, several critical things about the device appear. First, and most important, is the fact that as judicially created this presumption is not intended to shift to a defendant any burden of persuasion. That however does not foreclose the possibility that by an erroneous instruction, or as a necessary consequence of a correct statement of the presumption, the burden

of persuasion might be impermissibly shifted in a jury's mind.

Second, the practical effect of the device is to require a criminal defendant to do something more than merely stand on his "general issue" plea of not guilty in order to hold the state to its full ingoing burden of persuasion on all elements of the crime unaided by any compelled inference of "elemental fact" from proven "basic" fact.

Third, proper administration of the device depends upon the trial judge's accurate determination as to whether the defendant's production burden has been carried—whether the defendant has produced at least "some" evidence to dissipate the putative presumption. If there is "some" evidence in a particular case but the trial judge erroneously determines that there is not, and on that basis submits the issue of malice and/or unlawfulness subject to the mandatory presumption, the effect would necessarily be to "curtail[ ] the [jury's] freedom to assess the evidence *independently*," *Allen*, 442 U.S. at 156, 99 S.Ct. at 2224 (emphasis added), i.e., on the conflicting evidence alone. Such a specific trial error would presumably be of constitutional dimensions, and would be subject to free appellate review.[4]

Fourth, the presumption that finally effectuates the device has the flat effect of making proof of intentional killing with a deadly weapon in circumstances containing no suggestion of "heat of passion on sudden provocation" or of "self-defense" tantamount to proof of "malice" and "unlawfulness."

## II

To determine the constitutionality of the overall procedural device, including but not limited to the culminating jury instruction,

---

3. These principles are reflected in the semi-official pattern jury instructions manual currently in use in North Carolina trial courts. In critical part, this directs that the mandatory instruction as used in this case is to be used only "if there is no evidence in the case that the defendant acted in the heat of passion or in self-defense." On the other hand, the manual directs that "[i]f there *is* evidence of heat of passion or self defense," the jury should be instructed that "you may infer first, that the killing was unlawful,

and second, that it was done with malice, but you are not compelled to do so. You may consider this along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice." *North Carolina Pattern Instructions— Criminal* 206.30, p. 4, n. 3 (June 1985 ed.).

4. See note 2, *supra*.

therefore requires several related but independent inquiries. The first is whether, notwithstanding its intended effect, the jury instruction as given could reasonably have been interpreted by the jury to place upon defendant any burden of persuasion on disputed issues. The second is whether placing *any* burden of production upon a criminal defendant at peril of having invoked against him a mandatory presumption with respect to an element of the crime charged violates due process. The third is whether there was any evidence that tended to negate the existence of malice and unlawfulness, so that submitting the mandatory presumption *in this case* violated due process. The last is whether, all other possible objections aside, the mandatory presumption used here passes muster in terms of the rationality of its compelled inference of ultimate or elemental facts from proof of basic or evidentiary facts, in light of the defendant's unmet production burden.

### A.

The first question is whether, notwithstanding the intended function of the presumption in the jury's deliberation—that it should not shift to the defendant any burden of persuasion—it must nevertheless be found to have had that unconstitutional effect by virtue of the form and context in which it was submitted in the jury instructions.

*Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344, indicate that the presumption would surely have been unconstitutional on this basis had it been submitted in the context of those cases, i.e., where the presumed fact was a fully disputed element of the crime charged at the time of submission to the jury.

The constitutional vice found in the mandatory presumptions in those cases was their potential, in that context, for leading the jury reasonably to believe that because the law "presumed intent" from the doing of acts, this placed upon the defendant some burden to dissuade the jury of that presumed fact, an essential and *fully dis-* *puted element* of the crime charged. While this potential was, rather ironically, found heightened in *Francis* by the use of further language instructing that the presumption "may be rebutted" (clearly intended to avoid communicating an "irrebuttable" or "conclusive" effect), *see id.* at ——, 105 S.Ct. at 1968, the instruction in *Sandstrom* was found to have the impermissible potential without any comparable language affirmatively suggesting that it lay with the defendant to negate or rebut the presumed fact of intent. *See Sandstrom,* 442 U.S. at 513–15, 99 S.Ct. at 2453–54.

The mandatory presumption of malice and unlawfulness used in this case seems to me indistinguishable *in form of words standing alone,* from the presumption of intent used in *Sandstrom.* As indicated, *Sandstrom* and *Francis* surely make that form of mandatory presumption unconstitutional, as impermissibly likely to shift a burden of persuasion to the defendant, *when the presumed fact is fully in dispute on the evidence in the case.*

That leaves open the question, however, whether the same vice would attend the use of such a presumption when its only presumptive effect is in relation to constituent facts that had been taken out of issue by a defendant's failure to meet a production burden imposed by the state.

On this point, I agree with the majority that the technical effect of a defendant's failure to meet such a production burden should be treated as comparable to a judicial admission or evidence voluntarily offered by a defendant that concedes particular elements of a crime or any of its constituent facts. In such situations, the Supreme Court has recognized that burden-shifting presumptions whose only effect could have been in relation to facts taken out of issue by those unforced means cannot constitute constitutional error. *See Connecticut v. Johnson,* 460 U.S. 73, 87, 103 S.Ct. 969, 977, 74 L.Ed.2d 823 (1983).

Therefore, if production burdens may constitutionally be used to narrow the issues in a criminal case in this way, I agree that the same consequences should follow

the concession of issues by that device. But I believe that whether they may constitutionally be used for this purpose is the very issue on which the Supreme Court has reserved decision, and which is squarely presented for decision here.

### B.

That issue seems to me in turn to have two prongs: first, whether the use of any production burdens for this purpose is *ipso facto* unconstitutional; and second, if not, whether the use of the particular production burden here in issue is unconstitutional.

### (1)

I would first hold that the use of production burdens for this purpose is not *ipso facto* unconstitutional.

The unmistakable effect of production burdens such as that used here is to require a criminal defendant to "come forward" with at least a modicum of ("some") evidence in order to hold the state to the *full* burden of persuasion with which it entered trial. At that time, based solely upon the defendant's plea of the "general issue," not guilty, the state's burden was to prove beyond a reasonable doubt, unaided by any mandatory evidentiary presumption, all elements of the crime charged. A defendant's failure to meet this burden inevitably reduces both the scope and the weight of that ingoing burden of persuasion borne by the state.

Put in that way, the threshold constitutional question is whether forcing such a practical reduction in the state's persuasion burden by this means necessarily violates a defendant's due process right, as declared in *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), not to be convicted "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime ... charged." That could only be held if the due process right is one absolutely fixed by the defendant's

general issue plea of not guilty so that he may not be compelled thereafter by any device to relieve the state of the full scope and weight of its burden of proof as originally cast by the plea.

Though Justice Black, dissenting in *United States v. Gainey*, 380 U.S. 63, 74–88, 85 S.Ct. 754, 761–768, 13 L.Ed.2d 658 (1965), expressed views which if adopted by the Court might well have led to that result, the opposite conclusion seems compelled by every later intimation on the subject by the Supreme Court.

The most direct such intimation is probably the observation in *Mullaney* itself that "[m]any States do require the defendant to show that there is 'some evidence' indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt [citations omitted]. *Nothing in this opinion is intended to affect that requirement.*" *Mullaney*, 421 U.S. at 701 n. 28, 95 S.Ct. at 1891 n. 28; *see also id.* at 702, 703 n. 31, 95 S.Ct. at 1891, 1892 n. 31 (emphasis added). Nothing said in any later Supreme Court decision on the general subject suggests to me any change in that view,[5] which obviously was based upon the Court's perception that there was nothing so fundamentally unfair about production burden shifting devices as such that any and all forms violated due process. In the absence of any such indication of changed view on this since *Mullaney*, I think we must assume that the view there intimated still controls.

### (2)

That leads to the second question, whether the production burden at issue here might however be found unconstitutional as violative of due process because of its particular structure.

There must of course be ultimate due process limits on the extent to which a state can force criminal defendants to pro-

---

**5.** Indeed, in *Allen*, the Court, adverting to its observations on the subject in *Mullaney* and to its consideration of such presumptions in pre-*Mullaney* decisions such as *Tot v. U.S.*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), observed that "[t]o the extent that a presumption imposes an extremely low burden of production —e.g., being satisfied by 'any' evidence—it may well be that its impact is no greater than that of a permissive inference and it may be proper to analyze it as such." *Allen*, 442 U.S. at 158 n. 16, 99 S.Ct. at 2225 n. 16.

duce evidence in order to hold potentially disputed elements of crimes charged to them at issue, and by this means to narrow the scope of the state's ingoing burden of persuasion. As the Court pointed out in *Tot v. United States*, 319 U.S. 463, 469, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943), the government obviously cannot place on defendants the burden of producing evidence on all elements of the crime charged simply on the basis that an indictment has been returned. The question is, how far short of that, and on what basis, may the state go in this?

Because the underlying issue respecting the use of production burdens in general has not been definitively resolved by the Supreme Court, the question of their constitutional limits obviously has not been. I would find the limits in the same principles of connectional rationality that have been applied to determine the constitutionality of mandatory presumptions considered independently of any interrelated issue—narrowing production burdens. *See Allen*, 442 U.S. at 165–67, 97 S.Ct. at 2228–29; *Tot*, 319 U.S. at 468, 63 S.Ct. at 1245. The identical concerns of fundamental fairness are involved, though the context within which this must be judged is wider because of the need to take into account not only the basic and presumed facts of the culminating presumption, but the facts removed from issue by failure to meet the production burden.

To get at this, two inquiries are actually needed. The first is whether, looking only to the production burden, there is a fair and rational basis for requiring a criminal defendant to produce evidence on the *particular* elements or constituent facts on which evidence is required. Some facts obviously lend themselves by their very natures more fairly to this than do others. Without anticipating too broadly, it is obvious, for example, that requiring a defendant to produce alibi evidence to hold criminal agency itself in issue would present at least a different fairness problem than would requiring him to produce some evidence of non-intent in order to hold intent in issue, or of self-defense to negate unlawfulness.

Here I would have no problem finding a rational, hence fundamentally fair, basis for requiring a defendant to produce evidence of heat of passion provocation or self-defense in order to hold the elements of malice and unlawfulness, respectively, *fully* in issue in North Carolina murder prosecutions. These specific factual theories developed long ago in North Carolina common law as the means of negating the existence of malice and unlawfulness, once intentional killing with a deadly weapon was established. *See Hankerson*, 220 S.E.2d at 585, 586, 588. As such, they are in fact of the very substantive fabric of North Carolina common law murder as now codified, *see id.*, 220 S.E.2d at 586. By nature, each of these negating defenses lends itself readily to direct evidence that is necessarily available to a defendant. On the other hand, they do not, in common experience, relate to circumstances so likely to be in play in the run of homicides that it would be unfair to require at least some evidence of their existence in order to raise a triable issue in particular cases. The burden imposed is the ultimately modest one merely of producing "some" evidence.

The second inquiry is essentially that one mandated by the line of pre-*Mullaney* Supreme Court decisions represented by *Tot*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), as recently reviewed and reaffirmed in *Allen*, 442 U.S. at 165–67, 99 S.Ct. at 2228–29. That inquiry looks to the internal rationality of the presumption that in the case before us is the culminating element in the total issue-narrowing evidentiary device. It asks the question whether common experience demonstrates so rational a connection, looking to the "run of cases," between the basic facts and the presumed facts of the presumption that in a circumstance where the prosecution relies entirely upon the presumption to prove the elemental fact, a jury could infer the presumed or elemental fact from the basic fact beyond a reasonable doubt. *See Allen*, 442 U.S. at 167, 99 S.Ct. at 2230.

I would hold that the presumption, analyzed in that fuller context, meets that stringent test. Grounded in a long history

of applications running back to English common law origins, *see Hankerson*, 220 S.E.2d at 588, and widespread in variant forms in contemporary state practice, *see Mullaney*, 421 U.S. at 701, 702 n. 28, 95 S.Ct. at 1891 n. 28, it reflects "reason and experience," which though dependent "upon a view of relation broader than that a jury might take in a specific case," *Tot*, 319 U.S. at 467–68, 63 S.Ct. at 1245, satisfies the "reasonable doubt" test of accuracy in the run of cases.

Perhaps no more need be said, nor can be said, than that in common experience any time a killing is done intentionally with a deadly weapon under circumstances containing no suggestion that it was done in suddenly provoked passion or in self-defense, the most rational inference—certainly one that could be drawn beyond a reasonable doubt from those circumstances—is that it was done "with malice" (not in suddenly provoked passion) and "unlawfully" (not in justifying self-defense). This describes the connectional structure of this presumption, with its proven basic facts put in total circumstantial context by the lack of *any* evidence suggesting the possibility of a heat of passion or self-defense explanation.[6] The presumption therefore possesses the requisite connectional rationality to pass due process muster on that score.

### C.

Finally, a review of the record discloses that the trial judge properly concluded that in this case there was no evidence of heat

of passion nor of self-defense. Accordingly, there was no constitutional impediment on that basis for invoking the presumption.

For the foregoing reasons, I would hold the presumption and the related burden of production not unconstitutional as applied in this case.

---

**6.** Under this analysis, malice and unlawfulness are not taken wholly out of issue by failure to meet the production burden. Only the potentially negating defenses of heat of passion and self-defense are. The burden of persuasion remains upon the state to prove beyond a reasonable doubt the constituent facts of intent and deadly weapon use which, as a matter of developed substantive law, constitute malice and unlawfulness in the absence of heat of passion or self-defense. Faithful to this narrowing of the *potential* issues related to malice and unlawfulness, the presumption-based instruction submits the issues of malice and unlawfulness for proof by the state beyond a *reasonable doubt*, but with no opportunity to find them negated by the unproffered defenses.

In this process, the persuasion burden is expressly placed upon the state with respect to the only *disputed* facts related to malice and unlawfulness. The actual effect of the presumption therefore is merely to submit the malice and unlawfulness issues in their constitutionally narrowed form in accordance with state substantive definitions of the crime. *See Hankerson*, 220 S.E.2d at 588 ("The mandatory presumption is simply a way of stating our legal rule that in the absence of evidence of mitigating or justifying factors all killings accomplished through the intentional use of a deadly weapon are deemed to be malicious and unlawful").