**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-4044

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

JOHN W. BEARD,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.   James R. Spencer, District Judge.  (CR-03-265)

Argued:  September 30, 2004          Decided:  January 7, 2005

Before WILLIAMS, TRAXLER, and KING, Circuit Judges.

Reversed and remanded by unpublished per curiam opinion.

**ARGUED:** Michael James Elston, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant.  Amy Lee Austin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellee.  **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellant.  Frank W. Dunham, Jr., Federal Public Defender, Alexandria, Virginia; Mary E. Maguire, Assistant Federal Public Defender, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

The Government appeals the district court's order granting John Beard's motion to suppress statements he made to police officers. Because the district court applied the wrong legal test in determining that Beard was in custody, and because Beard was not in custody under the correct legal test, we reverse.

I.

On April 26, 2003, Richmond police received a report of a domestic disturbance at 1043 Barlen Drive. Two police officers, Officers Eugene J. Provost and Tim Degrauwe, responded to the report. Officer Provost interviewed Beard's mother, sister, and brother, while Officer Degrauwe went inside the house to speak with Beard.

Through his interviews, Officer Provost learned that Beard had threatened his sister with a shotgun. Officer Provost retrieved the shotgun from a van parked outside the house. After discovering that the barrel of the shotgun had been sawed off and was an illegal length, Officer Provost went inside to talk to Beard. Officer Provost found Officer Degrauwe and Beard, who was ironing clothes, in Beard's bedroom.

As Officer Provost entered the room, he signaled to Officer Degrauwe, "we [are] going to end up cuffing [Beard]." (J.A. at 21, 32.) There is, however, no evidence that Beard either observed or

2

understood this signal. Officer Provost then advised Beard of his "Miranda rights," (J.A. at 21), but exactly what Officer Provost said is unclear. Officer Provost questioned Beard about the shotgun, and Beard confessed that he was a convicted felon, the gun was for home protection, and he had accidentally pointed the shotgun at his sister the night before. The officers handcuffed Beard and took him to the police station. The entire episode, from the time Officer Provost walked into Beard's bedroom to the time the officers handcuffed Beard, happened very quickly. At the police station, the officers gave Beard a Rights Waiver Form, but Beard refused to sign it or to cooperate further.

On July 22, 2003, a grand jury sitting in the Eastern District of Virginia charged Beard in a two-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C.A § 922(g)(1) (West 2002) (Count One) and possessing an unregistered firearm in violation of 26 U.S.C.A § 5861(d) (West 2002) (Count Two). On December 1, 2003, Beard filed a motion to suppress his confession, arguing that it was taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966). On December 12, 2003, the district court held a hearing on the motion.

Officer Provost was the only witness who testified at the hearing. On the stand, he recounted the events that lead up to Beard's arrest. When he discussed whether he informed Beard of his rights at the house, Officer Provost stated that he had advised

3

Beard of his "constitutional rights," (J.A. at 21), his "Miranda rights," (J.A. at 21), or simply his "rights" (J.A. at 23.) The prosecutor did not ask Officer Provost to clarify exactly what he had said to Beard, and the district court closed the evidentiary portion of the hearing. At argument on the motion, Beard's attorney contended that Officer Provost's testimony was insufficient for the Government to carry its burden of showing it complied with Miranda. In response, the Government moved to reopen the record to allow Officer Provost to testify as to exactly what he said to Beard, but the district court denied the motion. The district court then granted the motion to suppress, finding that (1) the defendant was in custody for Miranda purposes, and (2) the Government had not shown that Officer Provost complied with Miranda:

> Now, the . . . issue was whether or not Mr. Beard was under a custodial situation at the time that these questions were propounded to him, and it is clear to the Court, and I find, that he was not free to leave. And that's the test. As Officer Provost walks into the room and gives the signal to Degrauwe, the question you ask is at that point in time, [if] Mr. Beard says, "Adios, I'm taking off, I'll see you guys later," would they let him leave? And the answer is clearly no. So he was in custody at the time.
>
> ***
>
> Provost indicated that, and I'll use the exact wording from the testimony, he was advised of his constitutional rights and in later questioning, referred to advised of Miranda rights. There was an indication to Officer Provost that the defendant understood these rights, whatever they were. And then there was some discussion. And in the course of that discussion, the defendant made certain statements. Among them, that he did indeed aim

4

the shotgun at his sister because he mistook her for someone trying to break into the house, and that the gun was for home protection. And I believe that he also indicated that he was a convicted felon. . . .

Now, the problem . . . is that the burden is on the government to establish that the particular warnings given to the defendant were such that they would reasonably convey to a suspect what his actual rights are. And there is no way that I can come to any conclusion about that because I don't know what was said. The Court has been clear that you don't have to have some specific language. It doesn't have to be talismanic. But it is also clear that there must be enough for the Court to say that what was said was reasonably calculated to convey the message that needed to be conveyed. On this record, obviously, I can't do that.

(J.A. at 32-34 (altered paragraph order).)

The Government noted a timely appeal, and we have jurisdiction under 18 U.S.C.A. § 3731 (West 2002 & Supp. 2004) (allowing interlocutory appeals from district court orders suppressing evidence if prosecutor makes appropriate certification).

II.

The Government argues that the district court erred in determining that Beard was in custody for <u>Miranda</u> purposes.[1] It contends that the district court applied the wrong legal test in determining that Beard was in custody, and that under the correct test, the facts show Beard was not in custody. (Appellant's

---

[1] The Government does not challenge either the district court's denial of its motion to reopen the evidence or the district court's conclusion that the Government failed to carry its burden of proving that Beard had received the necessary warnings under <u>Miranda</u>. (Appellant's Opening Br. at 3.)

5

Opening Br. at 6-11.)  We review a district court's factual findings on a motion to suppress for clear error and its legal conclusions de novo.  United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001).

In Miranda, the Supreme Court found that statements officers obtain by questioning a suspect in custody are presumptively compelled because of the inherently coercive nature of custodial interrogation.  384 U.S. at 457-58.  To protect the Fifth Amendment right against self-incrimination, see U.S. Const. amend. V ("[n]o person . . . shall be compelled in any criminal case to be a witness against himself"), such statements are generally inadmissible in the prosecution's case-in-chief unless the government overcomes the presumption by showing that officers first (1) warned the suspect that (a) he has the right to remain silent, (b) anything he says can be used against him, (c) he has the right to an attorney, and (d) if he cannot afford an attorney, one will be appointed to him, and (2) obtained a waiver of these rights. See Berkemer v. McCarty, 468 U.S. 420, 429 (1994) ("[I]f the police take a suspect into custody and then ask him questions without informing him of [his rights], his responses cannot be introduced into evidence to establish his guilt."); Miranda, 384 U.S. at 444 (listing warnings).

Miranda's exclusionary rule only applies, however, when officers elicit admissions by questioning a suspect who is "in

6

custody." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977). In this context, custody is a flexible concept, which does not require a defendant actually be handcuffed or behind bars. <u>See</u> <u>Texas v. Orozco</u>, 394 U.S. 324, 326-27 (1969) (holding that under certain circumstances, suspect can be in custody under <u>Miranda</u> in his own home). Rather, a suspect is in custody for <u>Miranda</u> purposes when, as in <u>Miranda</u> itself, the circumstances of the interrogation "exert[ ] upon a [suspect] pressures that . . . impair his free exercise of his privilege against self-incrimination," <u>Berkemer</u>, 468 U.S. at 437, or, in other words, when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" <u>Id.</u> at 440 (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)).

Because the <u>Miranda</u> Court was concerned with coercion, a reviewing court determines whether a suspect is in "custody" by first examining the totality of the circumstances surrounding the limitations on the suspect's freedom as the suspect himself perceived them. <u>See</u> <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995); <u>Berkemer</u>, 468 U.S. at 437-38. Second, a reviewing court must focus not on how the suspect <u>actually</u> interpreted these facts, but rather on what a <u>reasonable person</u> in the suspect's position would have thought knowing the facts available to him. <u>See</u> <u>Thompson</u>, 516 U.S. at 112; <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994). Therefore, "[a] policeman's unarticulated plan has no bearing on

7

the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 441.

In holding that Beard was in custody under Miranda, the district court found that

> [Beard] was not free to leave. And that's the test. As Officer Provost walk[ed] into the room and g[ave] the signal to Degrauwe, the question you ask is at that point in time, [if] Mr. Beard says, "Adios, I'm taking off, I'll see you guys later," would they let him leave? And the answer is clearly no.

(J.A. at 34.) The district court's test asked what the officers would have done if Beard had attempted to leave his bedroom; it neither focused on the circumstances as Beard perceived them nor examined the conclusions a reasonable man would draw therefrom. Cf. Thompson, 516 U.S. at 112. The district court therefore erred.

Applying the correct test, we conclude that Beard was not in "custody."[2] The facts here are similar to those in Parker, 262 F.3d at 417. In Parker, federal officers came to Parker's home and met with her and her family for approximately 20 minutes in the kitchen of the house. Id. at 418. The officers then requested to interview Parker in private, and her aunt pointed out a spare

---

[2] The ultimate issue of whether Beard was in custody under Miranda is one that we may decide. See Thompson v. Keohane, 516 U.S. 99, 112 (1995) (holding that Miranda custodial determination is a legal question qualifying it for "mixed question of law and fact" review under 28 U.S.C. § 2254(d)).

bedroom.  Id.  During the 30-minute bedroom interview, Parker's aunt twice entered the room to speak with her.  Id.  Parker did not leave the room during the interview, and at some point the officers informed her that she was not under arrest.  Id.  The officers testified, however, they would not have allowed Parker to leave the house had she attempted to do so.  Id.  On these facts, we found that the defendant was not in "custody":

> [Parker] was not handcuffed or otherwise restrained, and the agents did not draw their weapons in her presence. She was also in her own home during the questioning, and one of her relatives, at the relative's request, entered the interview room on two occasions during the questioning.  She was not forced to enter the room with the officers, and she was never told that she was not free to leave.

> The fact that one of the agents testified at the suppression hearing that they likely would have arrested Parker had she attempted to end the interview and leave the house does not successfully undercut the holding of the district court that Parker was not under the functional equivalent of arrest during questioning. Custody determinations do not depend on the subjective views of . . . the interrogating law enforcement officers . . . .  The agent's unarticulated views at the time [a suspect] was being questioned is of little weight.  The relevant inquiry is how a reasonable man would have understood the suspect's position at the time.

Id. at 419 (citations omitted).

Like Parker, Beard was not handcuffed or otherwise restrained. In addition, there is no evidence that the officers drew their weapons in Beard's presence or were antagonistic toward him.  Beard was in his own house, even his own room, and was never told that he was not free to leave.  Finally, there is no evidence that Beard

9

saw or understood Officer Provost's signal to Officer Degrauwe. Under these circumstances, we cannot conclude that a reasonable man in Beard's position would have believed his freedom of action was restrained to a "degree associated with formal arrest." Beheler, 463 U.S. at 1125.

Beard attempts to distinguish Parker by noting that (1) Beard was segregated from the other residents of the house, (2) Officer Provost was carrying the shotgun when he walked into Beard's bedroom, and (3) Beard was never allowed to associate with other household residents during the interview.[3] (Appellant's Br. at 7-9.) These factual differences do not change the outcome in this case. First, there is no evidence that the officers affirmatively segregated Beard from the other residents of the house; in fact, the testimony indicates that Beard either was ironing clothes in

---

[3] Beard also notes that the interview in Parker lasted 30 minutes, while here, the exchange between Beard and Officer Provost "happened very quickly." (Appellee's Br. at 9). But Beard does not point out, nor do we see, how this factual distinction helps him. In fact, common sense dictates that, all else being equal, a long interview is more likely than a short one to create a custodial situation.

Beard does not focus on the fact that in Parker officers told the suspect that she was not under arrest. While this factual difference is not irrelevant, we do not find it significant given the totality of the circumstances, including the facts that, (1) like in Parker, the officers never told Beard he was under arrest, see Davis v. Allsbrook, 778 F.2d 168,171-72 (4th Cir. 1985) ("Though informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, it is not a talismanic factor. Where, as here, the entire context establishes a lack of custody, failure to inform defendant of his status is not dispositive.") (citations omitted), and (2) here, unlike in Parker, the officers questioned Beard for only a short period of time.

10

his bedroom when the officers arrived or had enough freedom of movement after their arrival to go into his bedroom and begin ironing. These acts are simply inconsistent with a finding of custody under <u>Miranda</u>. Second, the fact that Officer Provost confronted Beard with the shotgun is not sufficient to put him into "custody." <u>Cf.</u> <u>Mathiason</u>, 429 U.S. at 495 (holding that interview at police station during which officers falsely told suspect that his fingerprints were found at crime scene was not custodial); <u>Beckwith v. United States</u>, 425 U.S. 341, 347 (1976) (holding that interview with IRS investigators at home of suspect during which investigators informed suspect that they were investigating his tax records was not custodial); <u>Davis v. Allsbrook</u>, 778 F.2d 168, 172 (4th Cir. 1985) (holding that interview at police station where officers showed suspect pictures of crime scene was not custodial). Third, there is no suggestion that Beard asked to speak to his relatives, that his relatives attempted to enter the bedroom, or that the officers would have prevented such entry. Beard was not, therefore, in custody when he gave the incriminating statements.[4]

---

[4] In so holding, we do not discount the possibility that the giving of <u>Miranda</u> warnings itself can contribute with other circumstances to put a suspect into "custody." <u>See</u> <u>Sprotsy v. Buchler</u>, 79 F.3d 635, 642 (7th Cir. 1996) (noting that the giving of <u>Miranda</u> warnings can be a relevant circumstance in determining whether custody exists); <u>Davis</u>, 778 F.2d at 172 (holding that the giving of <u>Miranda</u> warnings "by itself" does not create custody). Even assuming, however, that Officer Provost gave Beard the full panoply of <u>Miranda</u> warnings, this fact would not, when combined with the other circumstances of Beard's confession, be sufficient to transform what was an otherwise non-custodial situation into a

11

We conclude that the district court applied the wrong legal test to decide whether Beard was in custody under Miranda. Applying the correct standard, we conclude that Beard was not in "custody" when he gave the incriminating statements. We therefore reverse the district court's order granting Beard's motion to suppress and remand for further proceedings.

REVERSED AND REMANDED

---

custodial one. Cf. Sprotsy, 79 F.3d at 642 ("[I]n the context of a prolonged detention where there is persistent, accusatory questioning by several officers, the fact that the police observed certain formalities of a custodial arrest [such as giving the suspect Miranda warnings] without actually telling [the suspect] that he was not under arrest does provide some support for an inference that [the suspect] was in custody for purposes of Miranda.") (emphasis added); Davis, 778 F.2d at 112 (noting that giving of Miranda warnings could create custody where "a [subsequent] clash of wills over a suspect's desire to remain silent would create custody through overbearing police behavior."). On the facts of this case, Officer Provost's warnings, whatever they were, did not contribute with other circumstances to place Beard in custody.